STATE OF NORTH CAROLINA v. JAMES WALTER SLOAN, JR.

No. 349A85

(Filed 3 June 1986)

**1. Criminal Law § 42.6— swabs and slides taken from victim—chain of custody**

The State established a sufficient chain of custody of rectal swabs and slides taken from the victim to permit the admission of such exhibits and certain related testimony where, based on the detailed and documented chain of custody presented by the State, the possibility that the real evidence involved was confused or tampered with is too remote to require exclusion of the evidence, and where any weaknesses in the chain of custody relate only to the weight and not the admissibility of the evidence.

**2. Rape and Allied Offenses § 4— rectal slides—relevancy to prove penetration**

Rectal slides taken from the victim were relevant to prove that penetration of the rectum did occur where a doctor's testimony that material collected on a rectal swab came from within one centimeter length of the victim's rectum created an inference that spermatozoa detected on the slides were removed from inside the rectum. This inference was not destroyed by the fact that the doctor could not conclusively state that the swab did not also collect material from the rectal opening.

**3. Rape and Allied Offenses § 5— sufficient evidence of corpus delicti of rape**

The State produced sufficient *evidence aliunde* defendant's admissions to satisfy requirements of the *corpus delicti* rule and, when considered with defendant's first statement that he "did it" and his second attempted exculpatory statement that he had consensual sexual intercourse with the victim, such evidence was sufficient to permit a reasonable inference that the charged crime of rape occurred where it tended to show that after defendant had beaten the victim to the floor, he began removing her shorts and panties as she attempted to push her baby into the next room; the victim then lost consciousness, and when she was found after the crime, she was naked from the

waist down and her shorts and panties were lying on the kitchen floor; tests performed by a forensic serologist indicated the presence of semen and spermatozoa on the shorts and panties; and semen and spermatozoa could not be detected on a vaginal swab or slides because of the extreme amount of blood present in the vaginal tract.

**4. Rape and Allied Offenses § 5— sexual offense—sufficient evidence of rectal penetration**

The State produced sufficient evidence of rectal penetration to support defendant's conviction of a sexual offense where a doctor testified that material on a slide came from within one centimeter length of the victim's rectum and a forensic serologist testified that spermatozoa were detected on the rectal slide, notwithstanding the doctor also testified that spermatozoa found on the rectal swab used to prepare the slide could have been collected from deposits at the rectal opening rather than from inside the rectum.

Justice BILLINGS concurring in part and dissenting in part.

Justices EXUM and FRYE join in this concurring and dissenting opinion.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments entered by *Clark, J.,* at the 14 January 1984 Criminal Session of STANLY County Superior Court. We allowed defendant's motion to bypass the Court of Appeals on the Class H felony on 18 November 1985.

Defendant was charged in separate indictments, proper in form, with first degree rape, first degree sexual offense, felonious breaking or entering, and assault with a deadly weapon inflicting serious injury.

At trial, the State's evidence tended to show that on 9 August 1984 at approximately 2:30 p.m. Mrs. Sharon Shelton was at home with her fourteen-month old son in the James Creek Subdivision of Southern Pines. As she was cleaning the lunch dishes, Mrs. Shelton observed defendant walk through the yard and by her kitchen window. Mrs. Shelton recognized defendant because he had helped his brother, who operated a lawn company, work on her yard in July. She assumed he had returned to do other yard work that they had agreed upon.

Defendant went to the Sheltons' kitchen door and knocked. Mrs. Shelton, holding her young son, went to the door and unlocked the dead bolt with its key, leaving the key in the lock. She opened the door and asked defendant what work he would be doing. He did not reply but asked for a glass of water. Mrs. Shelton

went to the refrigerator in the kitchen, got some ice, put it in a glass with some water and handed it to defendant who was standing on the stoop outside the door.

Defendant then stated that he was not working for his brother anymore and asked for a ride home or to Pinehurst. Mrs. Shelton replied that she could not leave because she was expecting a man to come and look at her driveway. At that point, Mrs. Shelton became fearful because her conversation with defendant was not making sense. She told defendant that if he wanted more water he could use the outside faucet at the end of the house. With her baby beginning to cry, Mrs. Shelton started to shut the door. Defendant then moved towards the door and pressed against it to keep it open. As they struggled with the door, Mrs. Shelton, with the baby in her arms, tried to bolt lock the door, but in her panic engaged the lock too soon causing it to hit the wood of the door molding which prevented the door from closing.

Defendant finally burst into the kitchen, swinging a big long stick in his hands. Mrs. Shelton moved away from the door as defendant approached. She turned her back and pulled her child close to her to protect him from the stick. As she hunched over her child, defendant began to beat her in the head with the stick. Defendant finally beat them to the floor. Lying face down on the floor with her feet towards defendant, Mrs. Shelton tried to push her baby who continued to reach for her into the next room. As she pushed the child away, Mrs. Shelton felt defendant pull down her shorts and panties to the bottom of her legs. At that point in the attack, Mrs. Shelton became unconscious. She did not regain consciousness until after she had been taken to the hospital.

At approximately 3:00 p.m. that afternoon, George Denning arrived at the Shelton home with Paul Barbour to give a price estimate for paving their driveway. As they pulled into the driveway, Denning observed that the Sheltons' back door was open. Denning went to this door and heard a baby crying. He rang the bell and then told Barbour to get out the measuring wheel to measure the driveway. Denning continued to hear the baby cry and watched a small dog run in and out of the house, barking and acting strangely. Sensing that something was wrong, Denning entered the kitchen. He testified that "I never saw so much blood." Denning followed the trail of blood down the hallway to

the den where he found Mrs. Shelton wrapped in a quilt sitting behind the door facing frontward with her head propped up against the wall. Denning testified: "When we found Mrs. Shelton she looked horrified. I have never saw [sic] a look like that in my life on anything." The crying child was eight to ten feet away covered in blood. Denning examined the child and determined that he was unharmed. To help stop the blood which was gushing from Mrs. Shelton's head, Denning and Barbour placed a towel and washcloth on her head. Denning noticed that Mrs. Shelton had on no clothes from the waist down. Later when Denning walked into the kitchen, he saw her shorts and panties lying on the floor.

Mrs. Shelton who was in a dazed condition asked Denning and Barbour who they were and to call her husband. Denning called Yow Construction where Mr. Shelton worked. He instructed the woman who answered the telephone to call the rescue squad and to inform Mr. Shelton of his wife's condition. Denning then heard Mrs. Shelton tell Barbour that she knew who had assaulted her. Denning and Barbour remained at the Shelton home until after the rescue squad had transported Mrs. Shelton to the hospital, the police had arrived, and Mr. Shelton's parents had come to care for the child.

Between 3:15 and 3:30 p.m. that day, Steve Loomis was driving home from work. He noticed defendant hitchhiking and stopped to pick him up. As defendant entered the car, he told Loomis that he appreciated the ride because "he had just been in a fight and he didn't want the police to see him like that." Loomis testified:

> At that time I looked over at the defendant and noticed the blood. He was just covered with blood, had a white shirt and it was red colored, soaked with blood, blood on his arms, over his watch and he said that he had been in a fight with this guy. . . . He said that he used a club or a pipe or something, he struck the guy over the head with . . . a club or pipe.

Following defendant's directions, Loomis drove defendant to his home on Iowa Avenue. Although defendant asked him to wait for him to change clothes, Loomis stated that he was nearly out of gas and drove away. After reading about Mrs. Shelton's attack in

the local newspaper, Loomis contacted the police and showed them where he had taken defendant on that day.

The State's other evidence tended to show that on 10 August 1984 defendant was located at his uncle's house in Red Springs by local authorities and taken to the Red Springs Police Department. Detective Lanny Patterson and Captain Whitaker of the Moore County Sheriff's Department and Special SBI Agents Leroy Allen and Ken Snead arrived from Southern Pines, approximately twenty-five miles away, at 9:15 a.m. After being informed of his *Miranda* rights, defendant indicated that he wanted to exercise his right to remain silent and his right to an attorney. However, during his ride back to Southern Pines with the officers, defendant, on his own initiative, made the following statement:

> I did it. . . . I should have beat the bitch too [sic] death. If I get out, I'll kill her. I didn't cut her with a knife. Tell the bitch this is not over. Her husband will be next. I was going to kill her but I didn't because of the little boy. I went to talk to her about the lies she had told and I walked from my house to her's yesterday. I could have killed her if I wanted to. I worked around the house. She didn't take the warrants out because she won't [sic] able. It must have been her husband. I worked there with my brother. I went to talk to her. She had the kid in her arms when I went to the door. I hit her. When I realized it, I went home and changed clothes and came down here. I was looking for a prison dude's wife. If I had found her, I wouldn't have made it over there. If she explains what the reason is I won't get 20 years.

Upon finishing this statement, defendant said that he would talk to Special Agent Snead about the incident. Agent Snead told him to wait until they had reached Southern Pines. Other than that comment, nothing else was said to defendant.

When defendant and the officers arrived at the Southern Pines Police Department, Special Agents Allen and Snead once again advised defendant of his *Miranda* rights. At that time defendant agreed to waive his rights and .signed the form indicating that he wished to make a statement. Defendant then proceeded to tell his side of the story as follows:

I, Walter Sloan, Jr., of 1190 West Iowa Avenue, Southern Pines, do willingly give the following statement to V. L. Allen and K. R. Snead of the SBI on August 10, 1984 at 10:45 am, Southern Pines Police Department. I first went to her house and knocked on the door and when she opened the door, she said, 'Hello Sloan. I am glad to see you.' She, Mrs. Shelton, said that its been about two months since you were last over here. Then I asked her for a glass of water because I had just walked over there from my house because I was hot and exhausted. She then told me to come on in the house. I told her that no, it would not be nice to come in there because your husband was not there. Then she grabbed me by the arm and told me to come on in, that her husband didn't care about you coming in here. I told her that I don't like to come in people's houses when their husbands are not there. Then she told me come on in that I want you. When I got inside, she pulled down her shorts and panties and she then grabbed me by the arm and pulled me to her and that's when we started having sex, intercourse with each other. That made the third time that I had had sex with her, that's one reason I did not want to go into the house to start with. The first two times that I had sex with her was when I was over there cleaning the land for her and her husband. When I got ready to go, I got to the kitchen door, she grabbed me by the arms and told me that she loved me. I kept asking her to let me go but she would not so I had to hit her two times to get loose from her. After I hit her that time, I got loose and she ran after me outside and grabbed me again and that is when I pushed her to the ground, because she had blood on her hands because her head was bleeding and she had had her hands on the back of her head. And she grabbed me and that is when I got blood on my shirt. Then I ran out the driveway to the road in front of the house and that's all. I, Walter Sloan, Jr. have made this statement. No promises or threats have been made to me and no pressure has been used against me to make this statement.

Defendant's statement was taken down by Agent Allen. It was read and signed by defendant who added "I, Walter Sloan, Jr., also had a wood handle with a metal end. I throwed it in the bushes on the road coming to Southern Pines as you leave Mrs.

Shelton's house." Defendant later went with the agents and found the stick which was described as a broken shovel handle.

The State's medical evidence tended to show that Mrs. Shelton received severe head injuries during the attack. Dr. Seibert Harold Jacobson testified that there were multiple lacerations to the right posterior and right side of her head and multiple bone fractures in the right parietooccipital area. Dr. Jacobson stated:

> It was a patchwork of putting the skull back together because it had been lacerated in so many directions. I took out the bone fragments that needed to come out. There was a tear in the thick covering that is about the brain inside the skull. That was lacerated. There was a definite but small bruise to the brain with a small hematoma. The thick covering was repaired, the bone fragments that appeared to be viable were maintained. Those that did not appear to be viable were removed, and the scalp was sutured back together.

As a result of the attack, Mrs. Shelton was permanently injured. Dr. Jacobson testified that due to the damage to the right parietooccipital area of her brain Mrs. Shelton's ability to gather images in the left field of vision of both eyes has been impaired. In addition, she has residual scars in the scalp, a skull defect in those areas where bone skull fragments were removed, and a jaw disorder which may require a rebreaking of the jaw and braces.

Dr. Clifford James Long testified that he examined Mrs. Shelton on 9 August 1984 in the hospital operating room to determine whether she had been raped or sexually assaulted. Using swabs from a rape kit, Dr. Long took samples of the vaginal pool and the rectum and made slides. Joanna Medlin, a forensic serologist with the SBI, examined the rectal slides and determined the presence of spermatozoa. Agent Medlin testified that spermatozoa were not detected on the vaginal slides due to "an extreme amount of red blood cells and white blood cells which were present on these slides." She stated that "[h]ad spermatozoa been present, it very easily could have been washed out of the vaginal tract." Ms. Medlin further noted that she did not detect any semen on the vaginal swab for the same reason. Finally, Scott Warsham, a forensic chemist with the SBI, made comparisons of hair samples from defendant and from the Shelton home and found the samples to be "microscopically consistent."

Mrs. Shelton was recalled to the stand and testified that she did not consent to any sexual relations with defendant.

Defendant offered no evidence.

The jury returned verdicts of guilty of first degree rape, first degree sexual offense, felonious breaking or entering, and assault with a deadly weapon inflicting serious injury. Defendant was sentenced to consecutive life terms for the rape and sexual offense. The trial court imposed a ten-year sentence for defendant's conviction of felonious breaking or entering and arrested judgment on his conviction for assault with a deadly weapon inflicting serious injury on the ground that felonious assault is an element of the offenses of first degree rape and first degree sexual offense.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, for the State.*

*Benny S. Sharpe, for defendant-appellant.*

BRANCH, Chief Justice.

[1] By his first assignment of error, defendant contends that the trial court improperly allowed into evidence the rectal swab and slides taken from the victim and certain related testimony. Defendant argues that the State failed to establish a sufficient chain of custody to adequately identify these items as the ones taken from the victim.

The State's chain of custody evidence with regard to the rectal slides is as follows:

(1) Dr. Clifford James Long testified that he brought the rape kit, State's Exhibit 12, into the operating room with Mrs. Shelton. With cotton swabs taken from the kit, he sampled the victim's vaginal pool and rectum. From the swabs, he made slides which were appropriately identified by him or at his direction. Dr. Long stated that he actually sealed the rectal and vaginal slides and their respective swabs in separate containers, but that the rape kit box itself was sealed by the nurse. He indicated that the box was not sealed at that time because hair samples from Mrs. Shelton remained to be submitted by the nurse who was shaving her

head for her craniotomy. Dr. Long stated that he left the operating room before the rape kit box was sealed. Dr. Long identified State's Exhibit 12A as the rectal smears taken from Mrs. Shelton.

(2) Operating Room Nurse Marilyn Rogers testified that she observed Dr. Long use the swabs as indicated and make slides. She stated that she closed the rape kit box, State's Exhibit 12, and handed it to Deputy Sheriff Timmy Monroe who was waiting outside the operating room.

(3) Deputy Sheriff Monroe testified that he observed Mrs. Shelton in the operating room and received the rape kit box, State's Exhibit 12, from Nurse Rogers. He stated that he placed his identification marks on the box and that it remained in his presence until he gave it to Detective Lanny Patterson.

(4) Detective Patterson testified that he obtained the sealed rape kit box from Deputy Monroe, that he placed his identification marks on the box, and that it remained continuously in his possession until he delivered it to SBI Agent Pamela Tulley.

(5) Agent Tulley testified that she received the rape kit box, State's Exhibit 12, from Detective Patterson, and placed her identification marks on the box which remained in her custody until she delivered it to SBI forensic serologist Joanna Medlin.

(6) Agent Medlin stated that she received the rape kit box from Agent Tulley, placed her identification marks on the box, and removed from it State's Exhibit 12A, identified as "rectal smears collected from the rectum of Sharon Shelton." Agent Medlin further testified that she performed various tests on the rectal slides to determine the presence of spermatozoa.

Defendant argues in particular that the State's chain of custody with regard to the rectal swab and slides is insufficient because Dr. Long testified that he left the operating room before the rape kit box was sealed, that some of the writing on one of the rectal slides was not his, and that Nurse Rogers failed to

specifically testify that she observed Dr. Long take a rectal sample or make slides from the rectal swab.

We disagree that these alleged lapses in the rectal swab and slides chain of custody require that this evidence be excluded. The particular problems with the chain mentioned by defendant are easily solved by the testimony of other witnesses. For instance, although Dr. Long admitted that he left the operating room before the rape kit box was sealed, Nurse Rogers testified that she was in the operating room the entire time with the box and that items placed inside the box by Dr. Long were in the same condition when she observed the placement of other items into the box immediately before she closed it and handed the box to Deputy Monroe. Moreover, although Dr. Long stated that some of the writing on one of the rectal slides was not his, he testified that he gave the slides to the nurse who would have written the identification on the slides. He further indicated that State's Exhibits 12A were in fact the slides he made from Mrs. Shelton's rectum. Finally, even though Nurse Rogers failed to state that she observed Dr. Long take a rectal sample and make slides from this sample, Dr. Long specifically testified that he placed a cotton swab into Mrs. Shelton's rectum and prepared two slides from the swab which he sealed in a cardboard container and placed into the rape kit box.

In determining the standard of certainty that is required to show that an object offered is the same as the object involved in the incident and is in an unchanged condition, the trial court must exercise sound discretion. *State v. Campbell,* 311 N.C. 386, 388-89, 317 S.E. 2d 391, 392 (1984). We hold that the trial court did not abuse its discretion by allowing the rectal swab, slides, and related testimony into evidence. In the first place, defendant has provided no reason for believing that this evidence was altered. Based on the detailed and documented chain of custody presented by the State, the possibility that the real evidence involved was confused or tampered with "is simply too remote to require exclusion of this evidence." *State v. Grier,* 307 N.C. 628, 633, 300 S.E. 2d 351, 354 (1983). Furthermore, any weaknesses in the chain of custody relate only to the weight of the evidence, and not to its admissibility. *Id.*

[2]   Also, defendant argues under this assignment of error that even if the chain of custody was sufficiently established by the State, the rectal slides should, nevertheless, have been excluded. Defendant asserts that these slides were irrelevant for any purpose except to show penetration. Dr. Long testified that he inserted the swab into the rectum a centimeter, or one-half inch. According to defendant, because Dr. Long stated that the swab would gather anything it touched from outside the rectum to a centimeter inside the rectum, the slides did not establish that penetration had occurred and should not have been admitted into evidence.

Again, we disagree that this evidence should have been excluded. Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case. *State v. Hannah*, 312 N.C. 286, 294, 322 S.E. 2d 148, 154 (1984). *See also* N.C.G.S. § 8C-1, Rule 401 (Cum. Supp. 1985). Dr. Long's testimony that the material collected on the rectal swab "came within that one centimeter length of rectum" surely created an inference that the spermatozoa detected on the slides were removed from inside the rectum. This inference was not destroyed by the fact that Dr. Long could not conclusively state that the swab did not also collect material from the rectal opening. Rather, his testimony logically tends to prove that penetration of the rectum did occur. We hold, therefore, that this evidence was relevant and properly admitted by the trial court.

Defendant similarly assigns as error the admission of evidence relating to the vaginal swab and slides made from the victim. However, since this particular vaginal swab and slides showed no evidence of sperm or semen, defendant concedes that he was not prejudiced by the introduction of this evidence. Consequently, this assignment of error is overruled.

Defendant's remaining three assignments of error deal with the sufficiency of the evidence. Defendant contends that the trial court improperly denied his motions to dismiss the charges of first degree rape and sexual offense at the close of the State's evidence and at the close of all the evidence, and his motion to set aside the verdicts as being against the greater weight of the evidence.

[3]  With regard to his rape conviction, defendant argues that the State produced no evidence, apart from his statement, that he raped or specifically engaged in vaginal intercourse with the victim. Defendant is correct in his assertion that a naked extrajudicial confession, uncorroborated by other evidence, is not sufficient to support a criminal conviction. *State v. Franklin*, 308 N.C. 682, 304 S.E. 2d 579 (1983). According to the law of this jurisdiction, the State must at least produce corroborative evidence, independent of defendant's confession, which tends to prove the commission of the charged crime. *Id*. In *State v. Parker*, 315 N.C. 222, 337 S.E. 2d 487 (1985), this Court expanded the type of corroboration which may be sufficient to establish the trustworthiness of the confession in cases in which independent proof is lacking but where there is substantial independent evidence tending to establish the trustworthiness of the confession. *State v. Trexler*, 316 N.C. 528, 342 S.E. 2d 878 (1986). In *Trexler*, we reasoned that the pre-*Parker* rule is "still fully applicable in cases in which there is some *evidence aliunde* the confession which, when considered with the confession, will tend to support a finding that the crime charged occurred." *Id*., Slip. op. at 5. Thus, our *corpus delicti* rule in such cases only requires *evidence aliunde* the confession which, when considered with the confession, supports the confession and permits a reasonable inference that the crime occurred. It does not require that the *evidence aliunde* the confession prove any element of the crime. *Id*.

In the present case, we must apply the pre-*Parker* rule because there is some *evidence aliunde* the confession which tends to support a finding that the rape occurred. In the first place, Mrs. Shelton testified that after being beaten to the floor, defendant began removing her shorts and panties as she attempted to push her baby into the next room. Next, George Denning testified that after entering the Shelton home and rendering what first aid he could, he noticed that Mrs. Shelton was naked from the waist down and later spotted her shorts and panties lying on the kitchen floor as if they had been "stripped off her." Furthermore, SBI forensic serologist Medlin testified that she performed a series of tests on Mrs. Shelton's shorts and panties which indicated the presence of semen and spermatozoa on the clothing. Agent Medlin also explained that spermatozoa or semen could not

be detected on the vaginal slides or swab prepared by Dr. Long due to the extreme amount of blood present in the vaginal tract.

This evidence in conjunction with defendant's first inculpatory statement that "[he] did it" and his second attempted exculpatory statement that he had consensual sexual intercourse with Mrs. Shelton certainly permits a reasonable inference that the charged crime of rape, including the element of vaginal penetration, occurred. We hold that the State produced sufficient *evidence aliunde* defendant's admissions to satisfy the requirements of our *corpus delicti* rule and when considered with defendant's confession is sufficient to survive defendant's various motions to dismiss the rape charge against him.

[4] Defendant further contends that his motions to dismiss the sexual offense charge should have been granted. He argues that because Dr. Long stated on cross-examination that the spermatozoa found on the rectal swab could have been collected from deposits at the rectal opening, rather than from inside the rectum, the State failed to produce evidence that rectal penetration occurred. We disagree.

On a motion to dismiss, the evidence must be taken in the light most favorable to the State, and the State must be given the benefit of every reasonable inference deducible therefrom. *State v. Hardy*, 299 N.C. 445, 263 S.E. 2d 711 (1980). Based on Dr. Long's testimony that the material on the slide came from within one centimeter length of the rectum and Agent Medlin's testimony that spermatozoa were detected on the rectal slide, we hold that the State produced substantial evidence of the element of rectal penetration. *See generally State v. Brown*, 310 N.C. 563, 566, 313 S.E. 2d 585, 587 (1984). Thus, the trial court properly denied defendant's motions to dismiss the sexual offense charge against him.

For reasons stated, defendant received a fair trial free of prejudicial error.

No error.

Justice BILLINGS concurring in part and dissenting in part.

I dissent from the majority opinion insofar as it holds that the evidence was sufficient to support the jury's verdict of first degree sexual offense.

The only evidence relating to the commission of a sexual act (as opposed to sexual intercourse) by the defendant upon the victim was the testimony of SBI Agent Joanna Medlin that one of the two slides prepared by Dr. Long from material collected on a rectal swab contained spermatozoa. Dr. Long, the obstetrician-gynecologist who examined the victim on 9 August 1984, testified as follows about the collection of the material on the rectal swab:

Q. What did you do with the swab with reference to the rectum?

A. I took a cotton swab and introduced it into the rectum about a centimeter, then took it out and made two slides and then put the cotton swab itself into a separate package and submitted them both.

. . . .

Q. When you take a rectal swab, you insert the swab into the opening; is that correct?

A. Yes.

Q. And you just go how far in?

A. About a centimeter.

Q. And would you give us that in — Convert that into inches?

A. About ½ an inch.

Q. Of course, that swab would gather anything it touched from the outside of the rectum down into the area of the depth of the rectum that you went?

A. That's right.

Q. And any collected material would have been collected from the outside of the rectum or the opening of the rectum down to the depth of the centimeter; is that right?

A. Yes.

Q. And you did two of those?

A. Yes.

Q. And so there is no way to determine on a slide where that material on the slide actually came from, is that correct, what portion of the examination area?

A. It came within that one centimeter length of rectum.

Q. From the outside to one centimeter depth?

A. That's correct.

There was evidence that semen was found on the victim's clothing. Although she was unable to detect sperm or semen on slides made from swabs of the victim's vaginal tract, Agent Medlin testified that "[h]ad spermatozoa been present, it very easily could have been washed out of the vaginal tract." The rectal slides were not tested for semen. Dr. Long did not testify that he took any measures, such as cleaning the rectal opening before inserting the swab, which would have prevented any sperm located on the outside of the rectum from being picked up by the swab. Therefore, the fact that sperm was picked up by the cotton swab does not establish that the sperm was located inside the rectum. The conviction of sexual offense is based solely on an inference of penetration resulting from the presence of sperm on the rectal slide. If that sperm necessarily came from inside the rectum, that inference would be justified. However, since the evidence shows that it is equally as likely that the sperm picked up by the swab and placed on the rectal slide came from outside the rectum as from inside, there is insufficient evidence to support a finding of the premise upon which the inference is based, i.e., that sperm was located inside the victim's rectum. "A resort to a choice of possibilities is guesswork not decision." *Boyd v. Harper*, 250 N.C. 334, 339, 108 S.E. 2d 598, 602 (1959).

Although there was no direct evidence of vaginal penetration other than the defendant's confession that he and the victim "started having sex, intercourse with each other," the majority has relied upon that statement as an admission of vaginal penetration in support of the rape charge. I agree that the confession to "sex, intercourse" may reasonably be understood to refer to vaginal intercourse. The statement cannot reasonably be used, and the majority does not attempt to use it, to also support a finding of anal intercourse.

State v. Sloan

I would therefore hold that the evidence of first degree sexual offense was insufficient to support the conviction.

I concur in the remainder of the majority opinion.

Justices EXUM and FRYE join in this concurring and dissenting opinion.