STATE OF NORTH CAROLINA v. ANTONIO N. McALLISTER

No. COA07-1375

(Filed 6 May 2008)

## 1. Appeal and Error— Rule 2—chain of custody—no objection at trial—lengthy sentence

Rule 2 is an appropriate vehicle to review criminal cases when a defendant faces severe punishment. Here, an evidentiary issue was reviewed on its merits even though defendant conceded at the suppression hearing that his objections to the chain of custody were only to credibility and that he did not object at trial to its admission.

## 2. Evidence— hair samples found at scene—tampering—evidence not sufficient

There was no error in a prosecution for burglary, rape, kidnapping, and assault in the admission of evidence concerning hair samples found in a sock at the scene. Although defendant contended that the evidence had been tampered with, he offered no factual or legal support for the argument that the circumstances surrounding the discovery of the hair was suspicious.

## 3. Evidence— officer's history of violating storage protocol—remote and accidental—not admitted

The trial court did not abuse its discretion by excluding from a prosecution for rape and other crimes evidence that the lead investigator had been disciplined twice 15 years earlier for violating evidence storage protocol. The earlier events were remote in time and did not tend to prove deliberate criminal dishonesty.

## 4. Criminal Law— DNA evidence—supporting evidence present—sufficiency of DNA alone

The trial court did not err by denying defendant's motion to dismiss charges of burglary, rape, kidnapping, and assault for insufficient evidence. Although defendant contended that the State's evidence boiled down to three hair samples and DNA evidence, there was other evidence; moreover, defendant cited no authority for the contention that DNA evidence alone is not sufficient.

STATE v. McALLISTER

[190 N.C. App. 289 (2008)]

Appeal by Defendant from judgments entered 27 June 2007 by Judge Kenneth F. Crow in New Hanover County Superior Court. Heard in the Court of Appeals 3 April 2008.

*Attorney General Roy Cooper, by Special Deputy Attorney General Joyce S. Rutledge, for the State.*

*Reita Pendry, for Defendant.*

ARROWOOD, Judge.

Antonio McAllister (Defendant) appeals from judgments entered upon his convictions of first degree rape, first degree burglary, first degree kidnapping, and assault inflicting serious bodily injury. We find no error.

Defendant was tried before a New Hanover County jury in June 2007. The State's evidence tended to show, in relevant part, the following: Ms. Dora Corbett testified that in July 2005 she was seventy-eight years old and lived in rural Pender County, near Atkinson, North Carolina. Ms. Corbett's daughter, Emily Corbett Simpson, lived a few miles away. On the night of 5 July 2005, Ms. Corbett spoke with her daughter on the phone, then finished her evening activities, got in bed to read, and fell asleep with the light on.

Several hours after falling asleep, Ms. Corbett awoke to find that someone had tied her to the bed and was beating her face and head, especially her eyes and ears. This caused Ms. Corbett to experience "excruciating pain" and her eyes quickly swelled so much that she could not see the person hitting her. During the beating, Ms. Corbett was "in and out of consciousness." She told her attacker to take whatever he wanted, and he replied "Now, Ms. Corbett, here's what we're going to do. I'm going to rape you." She asked him to "just take [her] money" but he said "No" and gave "kind of a laugh." The attacker then engaged Ms. Corbett in forced sexual intercourse, while he choked her with his hands. The pain became so great that Ms. Corbett passed out. Ms. Corbett never heard a car.

The next time Ms. Corbett woke up, it was about 3:00 a.m. and she was alone. Her glasses were broken, her room was in disarray, and her wallet and keys had been taken from her purse. She was bleeding profusely and tried to call for help, but could not get a dial tone on her phone. Law enforcement officers later determined that the phone line had been cut. Ms. Corbett testified that she "knew

[she] would die if [she] didn't stop bleeding" so she decided to drive to her daughter's house. The drive, which normally would take ten minutes, took her an hour.

Emily Simpson testified that Ms. Corbett was her mother and that her mother called her on the night of 5 July 2005 to ask for a "wake up call" the next day. In the early morning hours of 6 July 2005, she and her husband were awakened by the sounds of a car horn and heard someone "stumbling around" and "sobbing and crying." They found a woman outside and, thinking there had been a car accident, brought her into their house. Emily called 911 to report a "little old lady" who was hurt. Ms. Corbett's face and neck were so swollen that Emily did not know the woman was her mother until her husband recognized Ms. Corbett's shoes and told her. Ms. Corbett was bleeding profusely, from her eyes, nose, mouth, and genital area. She said repeatedly that "He raped me" and told Emily and her husband that she had begged her attacker to stop beating her. There were bindings still tied to her arm.

Ms. Corbett testified that she knew Defendant's great-grandmother, who had worked on Ms. Corbett's family farm many years earlier. However, she did not know the Defendant and had never invited him to her house. In the hours following the rape, Ms. Corbett told several people that she couldn't see who raped her, but had been able to feel his hair, which felt "wooly" like "black person type hair." Later she had no memory of her statements to hospital or law enforcement personnel. Ms. Corbett suffered very serious injuries from the attack, including extensive genital lacerations and internal injuries requiring surgical treatment, and "significant facial fracture injuries." Virtually all the bones on the left side of her face were broken, including the bones of her cheek, sinuses, and eye socket, and she suffered long-term visual impairment.

Caroline Womble, the Pender County EMS ambulance driver, testified that she responded to the 911 call reporting Ms. Corbett's injuries. Ms. Corbett was wearing only a nightgown and slippers, was "bruised and bleeding" and her left eye was swollen shut. Ms. Corbett told Womble her assailant had "black person type hair." Cheryl Dorsett testified that she was a paramedic who treated Ms. Corbett on 6 July 2005. Ms. Corbett told Dorsett that she was sleeping and was awakened by someone who beat and raped her. Ms. Corbett thought her assailant was an African-American, based on the texture of his hair.

Lieutenant Cordelia Lewis of the Pender County Sheriff's Department testified that when she met with Ms. Corbett at the hospital on 6 July 2005, Ms. Corbett described her attacker as a man with "wooly" hair and a hard muscular body. Based on her discussion with Ms. Corbett, Lt. Lewis developed a possible list of suspects, focusing on African-American men living near Ms. Corbett. From "the very beginning" the Defendant was "at the top of [her] list." Lewis was able to eliminate several suspects, but could not find the Defendant.

Antonio Coley testified that he was a lifelong resident of the Atkinson area. He knew who Ms. Corbett was and lived within easy walking distance of her house. His uncle had an uninhabited trailer next to Coley's house, and around the time the assault on Ms. Corbett he began noticing things disturbed in the trailer. On 7 July 2005 Coley called the police to report that items in his uncle's trailer had been moved; window blinds were moved and doors cracked open. On 8 July 2005 Coley arrived home to find the trailer door open. As he walked inside, someone ran out the back door. Coley again reported a disturbance at the trailer to the local police. That evening, while Coley was visiting a cousin who lived nearby, he saw the Defendant. Coley testified that the Defendant, whom Coley had known all his life, was "really upset" that Coley had called law enforcement officers about the disturbance to the trailer. After "arguing back and forth" with Coley about Coley's call to the police, the Defendant left abruptly, saying "I'm gone. I'm out of here." After that, Coley no longer saw Defendant in the area and had no further trouble at his uncle's trailer.

Law enforcement officers testified about their investigation of the rape and assault suffered by Ms. Corbett. For purposes of this appeal, the most significant aspect of their testimony concerned the collection and processing of certain items of evidence. Detective Sergeant Lee Wells of the Pender County Sheriff's Department testified that on 6 July 2005 he responded to the report that Ms. Corbett had been assaulted in her home. He went to her house, secured it as a crime scene, noted the absence of tire tracks, and waited for the arrival of his supervising officer, Pender County Sheriff's Department Captain James Ezzell. Wells and Ezzell collected numerous items of evidence, including pieces of Ms. Corbett's clothing and bed linens, various objects found in her bedroom, personal items, and individual hairs. The law enforcement officers looked for items that might contain "any type of biological fluids . . . [h]airs, fibers, anything of that nature." They wore gloves when handling potential evidence, and

took photographs of Ms. Corbett's house and of items seized as evidence. The pieces of evidence were placed in bags and given sequential Pender County evidence numbers. Pender County Evidence, Number Fifteen (Pender 15) was a sock found near Ms. Corbett's bed, and Pender County Evidence, Numbers 45 and 72 (Pender 45 and 72) were individual hairs found in Ms. Corbett's bedroom.

The items of evidence collected by law enforcement officers were taken to the Pender County Law Enforcement Center and placed in a locked evidence storage area to which only Detective Wells and the Pender County Sheriff possessed keys. Detective Wells testified that Pender 15 was placed in a sealed bag and kept under his exclusive care, control, and custody, except when it was removed for forensic testing. The Sheriff's Department kept an inventory of the locked evidence, and documented the occasions when a piece of evidence was removed.

In September 2005 Pender County Sheriff's Department Detective Scott Lawson replaced Lieutenant Lewis as lead investigator in this case. Pender 45 and 72 had previously been submitted to the North Carolina State Bureau of Investigation (SBI) for analysis. SBI Special Agent Lucy Milks, who was qualified as an expert in trace evidence analysis, testified that she determined that Pender 45 and 72 were two "Negroid body hairs." The SBI kept the root of one of these hairs, to test its nuclear DNA. In September 2005, when Detective Lawson took over as lead detective, Agent Milks transferred the shafts of hair from Pender 45 and 72 to him. Detective Lawson took these hair shafts to LabCorp, a private agency, for further forensic testing.

LabCorp Associate Technical Director Dewayne Winston testified as an expert in forensic biology. He explained to the jury that the nucleus of a human cell contains DNA which is inherited from both parents, and is unique to each individual. Human cells also contain small organelles called mitochondria, and the mitochondria have their own DNA. Mitochondrial DNA is different from a cell's nuclear DNA and is inherited only from an individual's mother. Thus, an individual's mitochondrial DNA will be the same as other relatives in his maternal line, including his mother, grandmother, and siblings. If the mitochondrial DNA of two cells matches, the cells are almost certainly from the same person or from two people in the same maternal line, although there is a small chance (about 15/10,000) of two people randomly having the same mitochondrial DNA.

In December 2005 Dewayne Winston tested the mitochondrial DNA from Pender 45 and 72, the hair shafts collected from Ms. Corbett's bedroom. The mitochondrial DNA profiles of the two hairs were almost identical and therefore were consistent with the hairs being from either (1) the same individual, or (2) two people in the same maternal line. After Detective Lawson learned about the commonality in the mitochondrial DNA of the two hair shafts he had taken to LabCorp, he wanted to test these against known DNA samples from people identified as possible suspects. Several people were eliminated as possible suspects because their mitochondrial DNA was inconsistent with that found in Pender 45 and 72.

When local law enforcement officers were unable to find the Defendant, Lawson obtained the consent of Ms. Jessie Henry, the Defendant's mother, to test a DNA sample obtained from her. In April 2006 Lawson learned that this testing indicated a mitochondrial DNA match between the DNA sample from Defendant's mother and Pender 45 and 72, the hairs found in Ms. Corbett's bedroom. This indicated an overwhelming probability that the hairs constituting Pender 45 and 72 had come from the Defendant or someone in his maternal line. It was further determined that the Defendant's brothers, who would be expected to have the same mitochondrial DNA profile as Defendant, were both in custody at the time of the attack on Ms. Corbett.

On 24 April 2006 the Defendant was indicted on charges of first degree rape, in violation of N.C. Gen. Stat. § 14-27.2(a); first degree kidnapping, in violation of N.C. Gen. Stat. § 14-39; first degree burglary, in violation of N.C. Gen. Stat. § 14-51; and assault inflicting serious bodily injury, in violation of N.C. Gen. Stat. § 14-32.4. On 3 May 2006 Defendant was arrested in Florida and returned to North Carolina.

A search warrant was issued for collection of biological specimens from the Defendant and on 9 August 2006 Judy Mullis, the Pender County jail nurse, collected head hairs, pubic hairs, and a blood sample from Defendant. Mullis harvested these samples in the presence of witnesses, including Detectives Lawson and Wells, and the Defendant's attorney. Mullis placed each type of evidence in a separate sealed container, and placed all these containers inside a box, which was also sealed. The envelopes and the box were sealed with tamper-evident tape and initialed by Mullis in the presence of the others in attendance. Mullis gave Lawson the sealed box, identified as Pender 115. Lawson transported Pender 115 to the Law Enforcement Center a few blocks away. There he trans-

ferred Pender 115 to Detective Wells, who locked it in the evidence storage area. Lawson testified that he did not unseal, open, or otherwise tamper with Pender 115 when he took it from the jail to the Law Enforcement Center.

On 5 September 2006 Lawson took Pender 115 to LabCorp for forensic analysis and DNA testing. Before Lawson left, Captain Ezzell directed him to bring certain other pieces of evidence to LabCorp, in addition to Pender 115. These included Pender 15, the sock found near Ms. Corbett's bed. Lawson testified that he never opened, unsealed, or otherwise tampered with the evidence during the drive from Pender County to LabCorp. When Lawson arrived at LabCorp, he showed these items to LabCorp forensic analyst Shawn Weiss. To prevent cross-contamination, Lawson and Weiss wore a fresh pair of gloves for each item, and placed each item on a new piece of material. Weiss testified that neither Pender 15 nor Pender 115 showed signs of tampering.

When Lawson opened the sealed envelope containing Pender 15, the sock, both Lawson and Weiss observed three hairs inside the sock. These were placed in a separate sealed envelope. Later testing showed a nuclear DNA match between the blood sample taken from Defendant and nuclear DNA from the root of one of these hairs. The probability of the hair being from anyone other than the Defendant is infinitesimal, perhaps one in a thousand trillion.

The Defendant's evidence tended to show, in pertinent part, the following: Several witnesses testified that in July 2005 the Defendant was bald. He was staying with his grandmother, who testified that on 5 July 2005, the Defendant was at home with her.

Other evidence will be discussed as necessary to resolve the issues presented on appeal. Following the presentation of evidence, the jury found Defendant guilty of all charges. He was sentenced to consecutive prison terms totaling 572 to 715 months. From these convictions and judgments, Defendant appeals.

---

[1] Defendant argues first that the trial court erred by denying his motion to suppress certain pieces of evidence, including (1) Pender 15, the sock found in Ms. Corbett's bedroom; (2) hairs found inside the sock; and (3) the results of DNA testing of these hairs. He asserts that this evidence should have been excluded, on the grounds that the State "had not preserved the chain of custody of the evidence[.]" We disagree.

Preliminarily, we note that during the suppression hearing on this matter, defense counsel conceded that this evidence was legally admissible and that his objections to the chain of custody were "basically a credibility issue only." At trial, he did not object to its admission. He did not assign plain error to the admission of the sock or the hairs found within it, nor does he argue plain error on appeal. Accordingly, Defendant has waived appellate review of the admissibility of the sock, the hairs found in the sock, and the DNA testing results. However, in light of the extensive prison sentence imposed on Defendant (in essence a life sentence), we have elected to apply N.C.R. App. P. 2 and review the issue on its merits. Rule 2 is an appropriate vehicle to review criminal cases when a defendant faces severe punishment. *State v. Hart*, 361 N.C. 309, 644 S.E.2d 201 (2007). We conclude that admission of this evidence was neither error nor plain error.

[2] The "chain of custody" refers to the foundation that must be laid before real evidence is admitted:

> Before real evidence may be received into evidence, the party offering the evidence must first satisfy a two-pronged test. "The item offered must be identified as being the same object involved in the incident and it must be shown that the object has undergone no material change."

*State v. Fleming*, 350 N.C. 109, 131, 512 S.E.2d 720, 736 (1999) (quoting *State v. Campbell*, 311 N.C. 386, 388, 317 S.E.2d 391, 392 (1984)). In determining the sufficiency of the chain of custody:

> The trial court possesses and must exercise sound discretion in determining the standard of certainty that is required to show that an object offered is the same as the object involved in the incident and is in an unchanged condition. A detailed chain of custody need be established only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been altered. Further, any weak links in a chain of custody relate only to the weight to be given evidence and not to its admissibility.

*Campbell*, 311 N.C. at 388-89, 317 S.E.2d at 392 (citations omitted).

In the instant case, evidence about the chain of custody for Pender 15 included the following uncontradicted testimony:

STATE v. McALLISTER

[190 N.C. App. 289 (2008)]

1. Pender County Sheriff's Department Detective Wells testified that evidence was collected from Ms. Corbett's bedroom on 6 July 2005, by law enforcement officers who wore gloves. Items were placed into sealed containers and assigned sequential numbers. Pender 15 was a sock collected by law enforcement officers on 6 July 2005.

2. Detective Wells testified that after Pender 15 was collected from Ms. Corbett's bedroom, it was taken to the Pender County Law Enforcement Center and placed in a locked evidence storage area, to which only Wells and the Pender County Sheriff had a key.

3. Detective Wells testified that Pender 15 was under his exclusive care, custody, and control, unless removed for forensic testing. The Pender County Sheriff's Department kept a written record of the occasions when the exhibit was removed for testing.

4. Judy Mullis testified that she collected blood and head and pubic hairs from Defendant on 9 August 2006, placing each type of evidence in a separate sealed envelope or container. She also testified that one could not remove the sealing tape without ripping the envelope or otherwise making such tampering obvious.

5. Detective Lawson testified that he received Pender 115 from Mullis in the presence of witnesses, and that he transported it the few blocks to the Law Enforcement Center without opening or tampering with the evidence.

6. Detective Lawson testified that on 5 September 2006 he obtained Pender 15 and 115 from Detective Wells and took them to LabCorp for forensic testing. Pender 15 and 115 were under Lawson's exclusive custody during the drive from the Pender County Law Enforcement Center to LabCorp. Lawson testified that he did not open, unseal, or otherwise tamper with the evidence while it was in his custody.

7. LabCorp forensic analyst Shawn Weiss testified that he was present when Pender 15 was opened, and that it showed no signs of tampering or having been opened. Weiss and Lawson examined Pender 15 and both observed hairs inside the sock. Weiss testified that the hairs were placed in a separate enve-

lope for testing. Weiss also testified that the seals on Pender 115, the biological samples taken from Defendant, were intact.

Defendant does not dispute the existence of this and other evidence showing an unbroken chain of custody from the collection of the sock in Ms. Corbett's bedroom to the DNA testing of hairs later discovered inside the sock. Nor does Defendant challenge the existence of sworn testimony that Pender 15 and 115 were continually under the custody and control of either Detective Wells, Detective Lawson, or employees of LabCorp; that neither exhibit ever showed no signs of tampering; and that Detective Lawson testified that he did not open, unseal, or tamper with the evidence while it was in his control. We conclude that this undisputed evidence clearly establishes the chain of custody for Pender 15 and 115.

Defendant, however, asserts that Pender 15 was inadmissible, not because of any facial inadequacy in the chain of custody, but because other evidence raised "grave doubts about whether the evidence had been contaminated or tampered with." Defense counsel asserted at the suppression hearing that "it's our supposition that those hairs [in Pender 15] were placed in that sock by Detective Lawson." We conclude that the trial court did not err by rejecting Defendant's contention in this regard, or by allowing Pender 15 and associated exhibits to be admitted at trial.

Defendant directs our attention to the following facts and circumstances: (1) in September 2005, Detective Lawson was promoted from the canine squad to lead investigator on this case; (2) in September 2006, Pender 15 was in Detective Lawson's exclusive custody during the drive from Pender County to LabCorp; (3) Lawson was holding the sock when he and Weiss discovered hairs inside it; and (4) previous examination of the sock had not revealed the presence of hairs. On this basis, Defendant asserts that "Lawson had a powerful incentive to implicate" the Defendant; that "Lawson had the opportunity to tamper with" the evidence; and that the "circumstances are simply too suspect" for this Court to "find that the trial court's findings are supported by competent evidence and that the findings support the trial court's conclusion that the evidence is admissible." We disagree.

Defendant fails to offer any factual or legal support for the position that the circumstances surrounding the discovery of hairs in Pender 15 were "suspicious." "Based on the detailed and documented

chain of custody presented by the State, the possibility that the real evidence involved was confused or tampered with 'is simply too remote to require exclusion of this evidence.' Furthermore, any weaknesses in the chain of custody relate only to the weight of the evidence, and not to its admissibility." *State v. Sloan*, 316 N.C. 714, 723, 343 S.E.2d 527, 533 (1986) (quoting *State v. Grier*, 307 N.C. 628, 633, 300 S.E.2d 351, 354 (1983)). We conclude that Defendant "is unable to point to any precise lapse in the chain of custody, nor has he argued that the evidence was immaterial or irrelevant. The assignment of error is without merit." *State v. Corbett*, 307 N.C. 169, 181, 297 S.E.2d 553, 561 (1982). This assignment of error is overruled.

[3] The Defendant next argues that the trial court abused its discretion when it sustained the State's objection to Defendant's cross-examination of Detective Lawson about certain incidents in Lawson's professional history. We disagree.

Evidence elicited on voir dire tended to show the following; In 1990 or 1991, more than fifteen years before the trial, Detective Lawson was employed as a law enforcement officer by the King, North Carolina, police department. During his tenure with the King police force, Detective Lawson was disciplined twice for violating the protocol for storage of evidence. In one incident, Lawson returned a firearm to the evidence storage area at a time when the evidence custodian was absent. Instead of waiting for the custodian's return, Lawson locked the gun in a file cabinet where it stayed for a few hours. In the other incident, Detective Lawson needed to return a paddle that was evidence in a child abuse case to the evidence storage area. As with the firearm, Lawson erred by returning the paddle to the wrong place. Neither of these incidents involved dishonesty, lying, or other ethical lapse on Lawson's part.

In the present case, Defendant asserted that Detective Lawson intentionally, dishonestly, and illegally tampered with evidence by planting hairs inside a sock. The trial court ruled that evidence of the 1990 and 1991 incidents was inadmissible because (1) the earlier events were too remote in time; and (2) evidence of Lawson's having mistakenly returned evidence to the wrong place did not tend to prove that, years later, Lawson would engage in deliberate criminal dishonesty. We agree with the trial court and conclude that the court did not abuse its discretion in excluding this evidence. This assignment of error is overruled.

**[4]** Finally, Defendant argues that the trial court erred by denying his motion to dismiss the charges for insufficient evidence. "On a motion to dismiss on the ground of insufficiency of the evidence, the question for the court is whether there is substantial evidence of each element of the crime charged and of the defendant's perpetration of such crime." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983). Defendant does not dispute the sufficiency of evidence that Ms. Corbett was the victim of a first degree burglary, first degree kidnapping, first degree rape, and assault inflicting serious bodily injury. However, Defendant challenges the sufficiency of the evidence that he was the perpetrator of these offenses. Defendant contends that the State's evidence "boils down to two hairs from which mitochondrial DNA results were obtained" and a "single hair" from Pender 15, from which nuclear DNA matching that of the Defendant was obtained. We disagree.

We first note that "appellant has cited no authority which supports his contention that DNA evidence alone cannot sufficiently prove identity." *Engram v. State*, 341 Ark. 196, ——, 15 S.W.3d 678, —— (2000). Defendant does not challenge the admission of the evidence of a mitochondrial DNA match between Defendant's mother and two hairs found in Ms. Corbett's bedroom. This evidence strongly suggests that the assailant was someone in the same maternal line as Defendant's mother, and his two brothers were in custody when the attack took place. In addition, nuclear DNA testing identifies Defendant as the source of those hairs to a mathematical certainty.

Moreover, in addition to the mitochondrial and nuclear DNA evidence, other evidence tended to show that: (1) Ms. Corbett lived in a relatively unpopulated rural area; (2) the attacker called Ms. Corbett by name; (3) there were no tire tracks at Ms. Corbett's house and she did not hear a car; (4) Defendant grew up in the same neighborhood as the victim; (5) on 5 July 2005 the Defendant was staying or living within walking distance of the victim's house; (6) Defendant was angry that Coley called the police to report a disturbance at his uncle's trailer around the time of the assault and told Coley he was leaving; and (7) after that conversation, Coley didn't see Defendant in the area again. We conclude that the trial court did not err by denying Defendant's motion to dismiss for insufficiency of the evidence. This assignment of error is overruled.

For the reasons discussed above, we conclude Defendant had a fair trial, free of reversible error.

No error.

Judges McCULLOUGH and STEELMAN concur.