STATE OF NORTH CAROLINA v. KENNETH MARK HARTLEY

No. COA10-964

(Filed 17 May 2011)

## 1. Confessions and Incriminating Statements— pre-Miranda statement—not custodial

Defendant was not in custody when he confessed to first-degree murder and other offenses where he was twice told that he was not under arrest, voluntarily accompanied officers was never handcuffed rode in the front of the officers' vehicle was offered food, water, and the use of the restroom was never misled or deceived was not questioned for a long period of time and the officers kept their distance during the interview and did not employ any form of physical intimidation. A pat-down did not automatically create a custodial situation, and a policeman's unarticulated plan had no bearing on whether a suspect was in custody.

## 2. Constitutional Law— two-stage interrogation—no violation of Fifth Amendment

Defendant's Fifth Amendment rights were not violated by a two-stage interrogation process in which defendant confessed, was given *Miranda* warnings, and confessed again. Defendant was not in custody when the first confession was given.

## 3. Constitutional Law— effective assistance of counsel—no objection at trial

Defendant did not receive ineffective assistant of counsel, and no further investigation was needed, where his trial attorney

1

did not object to his confession at trial but there was no error in the admission of the confession.

**4. Constitutional Law— right to confront witnesses—pathologist who did not perform autopsy**

Defendant's right to confront the witnesses against him was not violated where autopsy results were not presented by the pathologist who had performed the victims' autopsy. While the pathologist who testified made minimal reference to the reports of the pathologist who performed the autopsies, those reports were not admitted and the testimony primarily consisted of a description of the victims' injuries as depicted in photos, the result of the wounds, and ultimately the cause of death. Moreover, there was overwhelming evidence of the manner in which defendant killed the victims.

**5. Evidence— DNA swabs—authentication—chain of custody**

There was no plain error in the admission of swabs used for DNA matching in a rape prosecution where the evidence was sufficiently authenticated and any weakness in the chain of custody did not render the exhibit inadmissible.

**6. Constitutional Law— Confrontation Clause—officer's description of autopsy exhibit**

There was no Confrontation Clause violation in a rape and murder prosecution where an officer testified that an exhibit contained swabs taken from a victim at an autopsy.

**7. Criminal Law— prosecutor's argument—specific intent—personal belief**

The trial court did not err in a prosecution for first-degree murder and other offenses by failing to intervene *ex mero motu* in the prosecutor's argument on diminished capacity and specific intent. Moreover, remarks by the prosecutor which defendant contended expressed a personal belief did not warrant a new trial.

**8. Criminal Law— instructions—insanity—pattern jury instructions**

The trial court did not err by giving the pattern jury instruction on the consequences of a verdict of not guilty by reason of insanity rather than defendant's requested instruction.

**STATE v. HARTLEY**

[212 N.C. App. 1 (2011)]

**9. Criminal Law— reinstruction—specific intent and diminished capacity—burden of proof not shifted**

There was no plain error in a prosecution for first-degree murder where defendant contended that the trial court's reinstruction on specific intent to kill did not lower the State's burden of proof. The reinstruction was an attempt to remedy any confusion about the burden of proving specific intent; it was never unclear that specific intent, and not just the ability to form it, was required for a conviction of first-degree murder.

Appeal by defendant from judgments entered 2 December 2008 by Judge D. Jack Hooks, Jr. in Sampson County Superior Court. Heard in the Court of Appeals 22 February 2011.

*Attorney General Roy Cooper, by Assistant Attorney General Joan M. Cunningham, for the State.*

*Appellate Defender Staples S. Hughes, by Assistant Appellate Defenders Anne M. Gomez and Kathleen M. Joyce, for defendant-appellant.*

HUNTER, Robert C., Judge.

Kenneth Mark Hartley ("defendant") appeals from \judgments entered after a jury found him guilty of three counts of first degree murder, attempted first degree rape, and first degree sexual offense. After careful review, we find no error.

## Background

On the morning of 18 June 2004, the bodies of Gail Tyndall ("Gail"), her daughter T.B. (age nine), and her son R.B. (age 14) were discovered in their trailer in Sampson County, North Carolina.[1] Officers then began looking for defendant who was Gail's 21-year-old son and the half-brother of T.B. and R.B. At approximately 9:51 p.m., SBI Special Agent James Tilley and Captain Ricky Mattocks of the Sampson County Sheriff's Department saw defendant walking along Highway 421. The officers pulled over, approached defendant, and asked him if he knew about anyone being hurt at his home. Defendant responded that he did not know about the situation at his home. The officers asked defendant if he would accompany them to the investigation headquarters at the Plainview Fire Department and he agreed.

---

1. The initials of the minor victims are used throughout this opinion.

In less than an hour after arriving at the Fire Department, defendant confessed to Special Agent Sheila Quick and Sergeant Julian Carr that he had killed Gail, R.B., and T.B. Defendant was then arrested and read his *Miranda* rights, which he waived. Defendant again confessed to the killings and signed a written confession.[2]

According to defendant's confession, his family members went to bed at around 12:00 a.m. on 18 June 2004. Defendant went to his bedroom and began watching television, but he "just started thinking about stabbing [his] mom." Defendant did not know "where the thoughts came from"; he had never thought about stabbing her before and he was not angry with her. Defendant admitted to thinking about stabbing his mother for around 15 or 20 minutes. At approximately 1:30 a.m., defendant retrieved a knife he had recently purchased and then walked to his mother's bedroom door. He "waited a minute to make sure she was asleep" and then entered the bedroom. Defendant stated that his mother was lying in the center of the bed with her back to him when he began stabbing her with the knife. She awoke immediately and began screaming and trying to fight defendant. Defendant continued to stab her until she stopped screaming. At about the same time Gail stopped screaming, R.B. came into the bedroom and turned on the light. Defendant then began stabbing R.B. until he fell face forward into the doorway of the bedroom.

Defendant confessed that he then put the knife on the kitchen table, found some duct tape, and proceeded to T.B.'s bedroom. When he entered the room, T.B. awoke and asked him what he was doing. Defendant told her to put a piece of clothing from the floor into her mouth, which she did. He then used the duct tape to bind her hands behind her back and tape her mouth shut. Defendant then instructed T.B. to walk to his bedroom where he undressed her and himself. Defendant attempted to have sex with T.B. vaginally "for a few minutes[,]" but was unable to achieve penetration. Defendant then had anal sex with T.B. Defendant admitted that he tried to strangle T.B. with a shoelace, but "it wasn't working[,]" so he strangled her with his arm for about five minutes until she stopped moving.

Defendant told police that he then washed his arms in the bathroom sink and changed clothes. Defendant took all of the telephones in the house and placed them in the bathroom so that the victims could not find them "if they didn't die." Defendant washed the knife

2. The circumstances surrounding defendant=s confession will be discussed in greater detail *infra.*

and gathered a flashlight, portable television, and cash to take with him. He then began walking in the direction of Dunn, North Carolina.

Defendant was charged with three counts of first degree murder, one count of attempted first degree rape, and one count of first degree sexual offense. At trial, it was undisputed that defendant killed the three victims and perpetrated sexual acts on T.B.; however, defendant claimed that he was not guilty of the crimes charged due to his being insane. In support of his defense, defendant offered the testimony of two mental health experts, Dr. Manish Fozdar and Dr. Ann Burgess, who claimed that defendant suffered from pervasive developmental disorder ("PDD"), a type of neurodevelopmental disorder, and that due to his mental illness defendant did not have the capacity to differentiate between right and wrong or appreciate the nature of his actions. Dr. Charles Vance, an expert witness for the State, testified that while defendant likely suffered from schizoid personality disorder ("SPD"), and possibly PDD, defendant knew the difference between right and wrong and had the ability to form the specific intent to kill.

On 22 November 2009, the jury convicted defendant of three counts of first degree murder on the basis of malice, premeditation, and deliberation. The jury also convicted defendant of the first degree murder of T.B. pursuant to the felony murder rule, attempted first degree rape, and first degree sexual offense. The jury recommended that defendant receive life imprisonment rather than the death penalty. The trial court sentenced defendant to three terms of life imprisonment without the possibility of parole, 240 to 297 months imprisonment for the first degree sexual offense conviction, and 157 to 198 months imprisonment for the attempted first degree rape conviction. Defendant timely appealed to this Court.

## Discussion

### I. Motion to Suppress Confession

[1] Defendant argues that the trial court erred in denying his motion to suppress his confession to the murders of Gail, T.B., and R.B. Specifically, defendant argues that his confession was given while in custody prior to being advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966).

Although defendant argues on appeal that the trial court erred in denying his pre-trial motion to suppress the confession, defendant did not object at trial to the admission of his confession into evidence. It is well established that

a motion *in limine* is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial. . . . [A] pretrial motion to suppress, a type of motion *in limine*, is not sufficient to preserve for appeal the issue of admissibility of evidence.

*State v. Grooms*, 353 N.C. 50, 65-66, 540 S.E.2d 713, 723 (2000) (internal citation omitted), *cert. denied*, 534 U.S. 838, 151 L. Ed. 2d 54, 70 (2001); accord *State v. Golphin*, 352 N.C. 364, 449, 533 S.E.2d 168, 224 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Nevertheless, defendant is entitled to relief if he can demonstrate plain error. *Golphin*, 352 N.C. at 449, 533 S.E.2d at 224.

[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] . . . amounts to a denial of a fundamental right of the accused," or . . . where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings[.]"

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). We must determine whether, absent the alleged error, the "jury probably would have returned a different verdict." *State v. Davis*, 321 N.C. 52, 59, 361 S.E.2d 724, 728 (1987).

The threshold issue to be decided is whether defendant was in custody when he first confessed to the murders prior to receiving the *Miranda* warnings, which "w[ere] conceived to protect an individual's Fifth Amendment right against self incrimination in the inherently compelling context of custodial interrogations by police officers." *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001). "Although the United States Supreme Court has acknowledged that the Fifth Amendment prohibits the use only of 'compelled' testimony, it has interpreted the *Miranda* decision as holding that failure to administer *Miranda* warnings in 'custodial situations' creates a presumption of compulsion which would exclude statements of a defendant." *Id.* at 336-37, 543 S.E.2d at 826 (citing *Oregon v. Elstad*, 470 U.S. 298, 306 07, 84 L. Ed. 2d 222, 230 31 (1985)).

"[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."

*Id.* at 337, 543 S.E.2d at 826-27 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977)).

"[I]n determining whether a suspect was in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). "We must therefore determine whether . . . a reasonable person in defendant's position would have believed that he was under arrest or was restrained in his movement to that significant degree." *State v. Garcia*, 358 N.C. 382, 396 97, 597 S.E.2d 724, 736 37 (2004), *cert. denied*, 543 U.S. 1156, 161 L. Ed. 2d 122 (2005); *accord State v. Waring*, —— N.C. ——, ——, 701 S.E.2d 615, 633 (2010). "This is an objective test, based upon a reasonable person standard, and is to be applied on a case by case basis considering all the facts and circumstances." *State v. Jones*, 153 N.C. App. 358, 365, 570 S.E.2d 128, 134 (2002) (internal citation and quotation marks omitted). "[Our Supreme] Court has considered such factors as whether a suspect is told he or she is free to leave, whether the suspect is handcuffed, whether the suspect is in the presence of uniformed officers, and the nature of any security around the suspect[.]" *Waring*, —— N.C. at ——, 701 S.E.2d at 633 (internal citations omitted).

In the instant case, on 18 June 2004 at approximately 9:51 p.m., Agent Tilley and Captain Mattocks approached defendant after he was located walking along Highway 421 in the direction of Dunn, North Carolina. Agent Quick and Sergeant Carr arrived soon there-

after. Agent Tilley asked defendant if his name was Kenneth Hartley and he responded affirmatively. Agent Tilley asked defendant if he was okay and he replied that he was okay. Agent Tilley then informed defendant that three people had been injured at his residence and asked him if he knew anything about the situation, to which defendant responded that he did not. Agent Tilley then asked defendant to place his hands on the vehicle so he could pat him down for weapons. Agent Tilley recovered two bundles of money from defendant's pants, but returned the money to defendant. It was apparent that defendant's clothes were damp and his hands were shaking. Agent Tilley told defendant that he would like to talk to him about what happened at the trailer and asked defendant if he would accompany him to the Plainview Fire Department, which was being used as a command post for the investigation. Defendant was not handcuffed and Agent Tilley told defendant that he was not under arrest. Defendant voluntarily went with the officers to the fire department, riding in the front passenger seat of the police car.

At the fire department, the officers entered a code to access the building and defendant followed them to a classroom where he was seated at one table while Agent Quick and Sergeant Carr sat across from him at a different table with an aisle separating the two tables. Defendant was asked if he wanted anything to eat or drink or if he needed to use the restroom. Defendant was again informed that he was not under arrest. Agent Quick asked defendant when he last saw his family and defendant responded that he had dinner with them at 8:30 p.m. and then left the house at about 1:00 a.m. while they were sleeping. He claimed that he was walking to Wal-mart and had not been home since 1:00 a.m.

Agent Quick noticed that defendant had cuts on his hands and when asked about them, defendant stated that he did not know how he had received the cuts. Agent Quick testified that at that time she decided that she would not allow defendant to leave, but she did not relay that decision to defendant; rather, she stated that there was forensic evidence at the scene that would likely lead to apprehension of the person suspected of killing defendant's family. She then asked defendant if there was anything else defendant would like to tell her, and defendant replied: "Yeah, I did it." Defendant then confessed to committing the murders in detail, stating that he stabbed his mother and then stabbed his brother who entered his mother's room. He then woke up his sister, gagged her, bound her hands with duct tape, attempted to have sex with her vaginally, had sex with her anally, and

then strangled her to death. Agent Quick testified that due to her concern for public safety, she asked defendant where the knife was located. Defendant told her that he hid it in the woods near a church.

At 10:41 a.m., Agent Quick left the room to inform Agent Tilley and District Attorney G. Dewey Hudson that defendant had confessed to killing his mother, R.B., and T.B. Sergeant Carr remained in the room with defendant. Soon thereafter, defendant was arrested and given the *Miranda* warnings. He was not handcuffed and he remained seated at the same table. Defendant then waived his rights under *Miranda* and restated his confession. Agent Quick wrote a statement on behalf of defendant as he gave his confession, read it back to defendant, and defendant signed the document.

In its order denying defendant's motion to suppress, the trial court concluded as a matter of law, *inter alia*, that under these facts and circumstances, defendant was not in custody when he gave his initial confession. We agree with the trial court and find no error, much less plain error, in the admission of defendant's confession at trial.

The following circumstances lead us to this conclusion: (1) defendant was told on two occasions that he was not under arrest; (2) defendant voluntarily accompanied the officers to the fire department; (3) defendant was never handcuffed; (4) defendant rode to the station in the front of the vehicle; (5) the officers asked defendant if he needed food, water, or use of the restroom; (6) defendant was never misled or deceived; (7) defendant was not questioned for a long period of time; and (8) the officers kept their distance during the interview and did not employ any form of physical intimidation. Our caselaw supports this holding under similar, albeit not identical, factual scenarios. *See e.g.*, *Waring*, —— N.C. at __, 701 S.E.2d at 633-34 (holding that defendant was not in custody where officers told him he was not under arrest, he voluntarily went with officers to the police station, was never restrained, was given bathroom breaks, and he was not deceived, misled, or threatened); *Gaines*, 345 N.C. at 658-63, 483 S.E.2d at 402-06 (holding that juvenile defendants who voluntarily went with police officers to the police station for questioning, but were told they were not under arrest, were not in custody); *State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993) (holding that defendant was not in custody where he was told several times that he was not under arrest and never asked to leave the interview); *State v. Phipps*, 331 N.C. 427, 443-45, 418 S.E.2d 178, 185-87 (1992) (holding that defendant who voluntarily accompanied officers to the police

station in a police car, waited in a lobby with unlocked external doors, and was told more than once he was not under arrest, was not in custody).

Defendant points out that he was subjected to a pat-down; the fire department required an access code; he was not offered medical attention; he was never left alone in the room; he had no previous experience with the state's criminal justice system; he was a suspect; and Agent Quick continued to ask him questions after she had subjectively determined that she would not allow defendant to leave had he tried. None of these factors alone are determinative, and, viewing them in context with the other factors discussed above, we are not persuaded that defendant was in custody. We point out that a pat-down search does not automatically create a custodial situation. *State v. Benjamin*, 124 N.C. App. 734, 738, 478 S.E.2d 651, 653 (1996). Furthermore, with regard to Agent Quick's intentions, " '[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.' " *Buchanan*, 353 N.C. at 341-42, 543 S.E.2d at 829 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 82 L. Ed. 2d 317, 336 (1984)). In sum, viewing the totality of the circumstances we hold that "a reasonable person in defendant's position would [not] have believed that he was under arrest or was restrained in his movement to that significant degree." *Garcia*, 358 N.C. at 396-97, 597 S.E.2d at 737.

[2] Defendant further argues that he was interrogated in a two-stage process by which the officers deliberately drew out a confession prior to giving the *Miranda* warnings, then provided the *Miranda* warnings, obtained a waiver, and asked defendant to repeat his confession. Defendant relies heavily on *Missouri v. Seibert*, 542 U.S. 600, 159 L. Ed. 2d 643 (2004), where the United States Supreme Court held that a confession obtained by a two-stage interrogation violated defendant's Fifth Amendment rights. The Court stated that "[t]he object of question first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 159 L. Ed. 2d at 654. The Court further reasoned:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. . . . For unless the warnings could place a sus-

pect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id.* at 611-12, 159 L. Ed. 2d at 655.

While the officers in this case questioned defendant, obtained a confession, *Mirandized* defendant, and then obtained a second confession, the key distinction between *Seibert* and the present case is that the defendant in *Seibert* was arrested prior to questioning. *Id.* at 604, 159 L. Ed. 2d at 650. Therefore, both confessions in *Seibert* were obtained while the defendant was in custody. As we have concluded, defendant was not in custody when the first confession was given. Defendant was not under arrest, unlike the defendant in *Seibert.* "Because these statements were voluntary and would have been admissible if offered into evidence, no issue arises under *Missouri v. Seibert*[.]" *Waring,* —— N.C. at ——, 701 S.E.2d at 634.

**[3]** Defendant also argues that he received ineffective assistance of counsel because his trial attorney failed to object to the confession at trial. "In general, claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal." *State v. Stroud,* 147 N.C. App. 549, 553, 557 S.E.2d 544, 547 (2001), *cert. denied,* 356 N.C. 623, 575 S.E.2d 758 (2002). However, ineffective assistance of counsel "claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required[.]" *State v. Fair,* 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001), *cert. denied,* 535 U.S. 1114, 153 L. Ed. 2d 162 (2002).

To successfully assert an ineffective assistance of counsel claim, defendant must satisfy a two prong test. First, he must show that counsel's performance fell below an objective standard of reasonableness. Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error.

*State v. Blakeney,* 352 N.C. 287, 307-08, 531 S.E.2d 799, 814-15 (2000) (internal citation omitted), *cert. denied,* 531 U.S. 1117, 148 L. Ed. 2d 780 (2001).

As stated *supra*, there was no error, much less plain error, in the admission of defendant's confession at trial. Consequently, we hold that no further investigation is required as to defendant's ineffective assistance of counsel claim and that defendant is unable to show that had defense counsel objected to the confession, "a reasonable probability exists that the trial result would have been different . . . ." *Id.*

## II. Confrontation Clause

[4] Next, defendant argues that his Sixth Amendment right to confront the witnesses against him was violated at trial when Dr. Deborah Radisch testified to the results of the victims' autopsies performed by Dr. Carl Barr who was not present to testify because he was recovering from surgery. Defendant objected to Dr. Radisch's testimony and the admission of Dr. Barr's file on Confrontation Clause grounds. Dr. Radisch testified that she reviewed Dr. Barr's autopsy results "in the course of [her] duties[,]" which requires her to review all of the medical examiners' cases. Dr. Radisch conducted a "more thorough review" of the reports shortly before trial. Defendant did not have the opportunity to cross-examine Dr. Barr before trial.

The Confrontation Clause of the Sixth Amendment bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203 (2004). In *Melendez-Diaz v. Massachusetts*, —— U.S. ——, ——, 174 L. Ed. 2d 314, 327-28 (2009), the Supreme Court determined that forensic analyses, including autopsy examinations, qualify as "testimonial" statements, and forensic analysts are "witnesses" to which the Confrontation Clause applies. Therefore, when the State seeks to introduce forensic analyses, "[a]bsent a showing that the analysts [are] unavailable to testify at trial *and* that petitioner had a prior opportunity to cross examine them," such evidence is inadmissible under *Crawford. Id.* at ——, 174 L. Ed. 2d at 322.

Since *Melendez-Diaz*, our courts have held that the Confrontation Clause prohibits the introduction of testimony by an expert witness that is based solely upon the reports of a non-testifying analyst. *See, e.g., State v. Locklear*, 363 N.C. 438, 451-52, 681 S.E.2d 293, 304-05 (2009); *State v. Hurt*, —— N.C. App. ——, ——, 702 S.E.2d 82, 99, *temporary stay allowed*, —— N.C. ——, 705 S.E.2d 349 (2010); *State v. Galindo*, —— N.C. App. ——, ——, 683 S.E.2d 785, 788 (2009). However, the expert testimony is permissible when the expert testifies "not just

to the results of other experts' tests, but to her own technical review of these tests, her own expert opinion of the accuracy of the non-testifying experts' tests, and her own expert opinion based on a comparison of the original data." *State v. Mobley,* —— N.C. App. ——, ——, 684 S.E.2d 508, 511 (2009), *disc. review denied,* 363 N.C. 809, 692 S.E.2d 393 (2010). Furthermore, any evidence offered "as the basis of an expert's opinion is not being offered for the truth of the matter asserted." *Id.* Thus, the critical distinction that we must make in order to address defendant's challenge to the admission of Dr. Radisch's testimony is determining whether she merely recited information previously reported by Dr. Barr or whether she testified to her own, independent expert opinion based on information of a type properly utilized in developing an expert opinion.

Upon review of the record, it is clear that Dr. Radisch provided her own expert opinion, not a regurgitation of Dr. Barr's reports. While Dr. Radisch made minimal references to Dr. Barr's autopsy reports, which were never introduced into evidence, her testimony primarily consisted of describing to the jury the injuries sustained by the victims as depicted in 28 autopsy photographs.[3] Dr. Radisch described the type of wounds, the pain the wounds would have inflicted, whether the wounds would have been fatal, and ultimately the cause of death of each victim. With regard to T.B., Dr. Radisch explained to the jury, through use of the photographs, that T.B. had been asphyxiated, how long it would have taken for her to lose consciousness, and that the blood seen in her vagina could have been menstrual blood or the result of attempted penetration.

Dr. Radisch's testimony is remarkably similar to that of the pathologist in *Hurt,* —— N.C. App. at ——, 702 S.E.2d at 86. There, Dr. Patrick Lantz testified as to the effect of the victim's stab wounds, the pain the wounds would have caused, and how long it would have taken for the victim to lose consciousness and die. *Id.* While this Court held that the testimony of other experts violated the defendant's rights under the Confrontation Clause, the Court noted the following with regard to Dr. Lantz's testimony:

---

3. Defendant argues that he objected to Dr. Barr's entire file on Confrontation Clause grounds, which included the autopsy photographs. These photographs formed the basis, at least in part, of Dr. Radisch's admissible expert opinion. Consequently, the photographs were admissible to provide the basis for her expert opinion and their admission did not violate defendant's confrontation rights. *Id.* Defendant further argues that the photographs were never properly authenticated and that they were unduly prejudicial; however, defendant did not object on those grounds at trial. Moreover, defendant stipulated that the photographs were of the three victims.

[W]e do not discuss Lantz's testimony to the non-testifying pathologist's autopsy findings at great length. For, even if Lantz's recitation of stab wounds visually observed by [the nontestifying expert] and listed in the latter's report are considered a type of testimonial forensic evidence contemplated by *Melendez-Diaz*, his description of [the victim's] stab wounds was not prejudicial. Several responding officers and EMS personnel also testified to the wounds they personally observed, and several photographs of the victim's body were published to the jury for inspection. *Moreover, Lantz's opinion testimony regarding the impact of the various wounds and the time it would have taken for [the victim] to lose consciousness was clearly based, not on the report at all, but on his own independent experience as a pathologist.*

*Id.* at —— n.5, 702 S.E.2d at 98 n.5 (emphasis added). As was the case with Dr. Lantz, Dr. Radisch's testimony as to the impact of the various trauma suffered by the three victims was based primarily on her inspection of the photographs that were admitted into evidence and her independent experience as a pathologist. The Court in *Hurt* declined to determine whether Dr. Lantz's initial recitation of the stab wounds observed and reported by the testifying expert violated the defendant's constitutional rights. *Id.* In the present case, Dr. Radisch made references to Dr. Barr's reports, but did not provide a recitation of the findings from the reports. However, as in *Hurt*, to the extent that Dr. Radisch recited any portion of Dr. Barr's reports, we hold that any such error was not prejudicial given the extensive testimony Dr. Radisch provided based strictly on her own personal knowledge as a pathologist, including the effect of the victims' various injuries and their cause of death.

Assuming, *arguendo*, that Dr. Radisch's testimony was erroneously admitted, the State has met its burden of proving that any error was harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b) (2009) ("A violation of the defendant's rights under the Constitution of the United States is prejudicial unless . . . it was harmless beyond a reasonable doubt."). " '[T]he presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt.' " *State v. Morgan*, 359 N.C. 131, 156, 604 S.E.2d 886, 901 (2004) (quoting *State v. Autry*, 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988)), *cert. denied*, 546 U.S. 830, 163 L. Ed. 2d 79 (2005). Dr. Radisch testified regarding the type of wounds inflicted on the victims and the cause of death. We fail to see how this testimony

affected the outcome of this case where the overwhelming evidence established that defendant killed the victims, and, by his own confession, the manner in which he killed them. As defendant admits in his brief, "[his] only defense to the charges was mental illness." Assuming Dr. Radisch's testimony violated defendant's Confrontation Clause rights, it was harmless beyond a reasonable doubt.

### III. State's Exhibit 39

**[5]** Defendant argues that State's Exhibit 39, a rectal swab taken from T.B. which contained sperm with DNA matching that of defendant, was not properly authenticated and was, therefore, erroneously admitted at trial. Defendant also argues that his right to confront the witnesses against him was violated because law enforcement testimony that the exhibit consisted of rectal swabs from T.B. was inadmissible testimonial hearsay of Dr. Barr who was not present to testify. Defendant has not preserved these arguments for appellate review as he did not object at trial on constitutional grounds or on authentication grounds. Nevertheless, we apply plain error review.

First, as to defendant's claim that the swabs were not properly authenticated, Rule 901 of the North Carolina Rules of Evidence requires "authentication or identification as a condition precedent to admissibility" of evidence. N.C. Gen. Stat. § 8C-1, Rule 901(a) (2009). The authentication or identification requirement is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* The evidence at trial tended to establish that Officer Lawrence Dixon processed evidence at the crime scene, was present for the autopsy of T.B., and obtained evidence related to the crime from Dr. Barr, including the rectal swabs, on 24 June 2004. The swabs were then placed in the custody of the Sampson County Sheriff's Office. The swabs were submitted to the SBI for analysis and later returned to the Sampson County Sheriff's Office where they were kept unaltered until the time of trial. We hold that Exhibit 39 was properly authenticated.

Still, defendant questions the chain of custody and argues that the swabs were taken on 19 June 2004, but were not picked up by Officer Dixon until 24 June 2004. Our Supreme Court stated in *State v. Sloan*, 316 N.C. 714, 723, 343 S.E.2d 527, 533 (1986) (quoting *State v. Grier*, 307 N.C. 628, 633, 300 S.E.2d 351, 354 (1983)):

In the first place, defendant has provided no reason for believing that this evidence was altered. Based on the detailed and docu-

mented chain of custody presented by the State, the possibility that the real evidence involved was confused or tampered with "is simply too remote to require exclusion of this evidence." Furthermore, any weaknesses in the chain of custody relate only to the weight of the evidence, and not to its admissibility.

As in *Sloan*, there is no reason to believe that Exhibit 39 was in any way altered and the possibility that this evidence was tampered with is remote. Consequently, any weakness in the chain of custody does not render the exhibit inadmissible. *Id.*

[6] Second, defendant claims that Officer Dixon's testimony that Exhibit 39 contained rectal swabs taken from T.B. violated his Confrontation Clause rights. Since the record permits a determination that Officer Dixon had personal knowledge of the source from which the rectal swabs admitted into evidence as State's Exhibit 39 were obtained, any objection to the admission of these swabs predicated on the theory that the testimony utilized to authenticate them was inadmissible for confrontation-related reasons lacks merit. In other words, Officer Dixon's testimony was sufficient to establish that Exhibit 39 contained rectal swabs taken from T.B. at the autopsy performed by Dr. Barr. The results of the tests conducted on the swabs were relayed to the jury by the experts who conducted the tests. SBI serologist Russell Holley testified that Exhibit 39 consisted of two rectal swabs that he personally tested for semen. SBI DNA analyst Amanda Thompson testified that the swabs contained DNA that matched that of defendant. In sum, defendant's constitutional rights were not violated by Officer Dixon's testimony and we hold that there was no error in the admission of Exhibit 39 at trial.

## IV. Prosecutor's Closing Argument

[7] Defendant argues that the prosecutor made improper statements during his closing argument at trial. Defendant did not object to these statements at trial. Consequently, our review is limited to "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu.*" *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002). "Under this standard, only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Taylor*, 362 N.C. 514, 545, 669 S.E.2d 239, 265 (2008) (citations and internal quotation marks omitted). "To establish such

an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

The prosecutor argued: "[T]he judge is also going to instruct you about lack of mental capacity. It's also called diminished capacity. And the defense made reference to that, in other words, you cannot form specific intent." Defendant claims that the prosecutor's statement misled the jury into believing that defendant could only be found not guilty of murder if he did not have the ability to form the requisite intent. Defendant claims that even if he had the ability to form specific intent, it does not necessarily mean that he did so on 18 June 2004. We do not believe that the prosecutor's statement could have led to a jury conviction on an improper basis. The prosecutor's statement accurately pointed out that the defense of diminished capacity is utilized to negate the specific intent necessary for murder. The prosecutor went on to argue that defendant formed the specific intent to kill, which was the State's burden to prove if defendant did, in fact, have the capability to form such intent. Moreover, the jury was instructed that in order to convict defendant of murder, the jury must find that defendant formed the specific intent to kill, not simply that he had the ability to form the specific intent to kill.

Defendant also points to the prosecutor's statements: (1) "The defendant is trying to escape responsibility for the actions he did back on June 18, 2004. If that . . . isn't murder, I don't know what is[,]" and (2) "I know when to ask for the death penalty and when not to. This isn't the first case, it's the ten thousandth for me." Defendant claims that through these statements, the prosecutor impermissibly expressed his personal belief as to defendant's guilt. Defendant cites *State v. Smith*, 279 N.C. 163, 165-66, 181 S.E.2d 458, 459-60 (1971) where the prosecutor stated, among other things, that he knew when or when not to call for a conviction in a capital case; however, the statements by the prosecutor in *Smith* went far beyond those of the prosecutor in the present case. The prosecutor in *Smith* went on a "tirade," stating that he does not try innocent men, and that a man who did what defendant was alleged to have done was " 'lower than the bone belly of a cur dog." ' *Id.* The prosecutor further called defendant a liar and stated, " 'I don't believe a living word of what he says about this case, members of the jury.' " *Id.* at 166, 181 S.E.2d at 460. We do not believe the prosecutor's remarks in the case *sub judice* rise to the level such that a new trial is warranted. We hold that the trial court did no err in failing to intervene *ex mero motu*.

## V. Requested Instruction on Commitment Proceedings

[8] Defendant contends that "[t]he trial court erred by failing to give [defendant]'s requested jury instruction on the commitment process." Where, as here, "a defendant interposes a defense of insanity and requests an instruction setting out the provisions for involuntary commitment, the trial court must instruct 'on the consequences of a verdict of not guilty by reason of insanity.' " *State v. Coppage*, 94 N.C. App. 630, 634, 381 S.E.2d 169, 171 (1989) (quoting *State v. Hammonds*, 290 N.C. 1, 15, 224 S.E.2d 595, 604 (1976)). In providing these instructions, the trial court must "set[] out *in substance* the commitment procedures outlined in [N.C. Gen. Stat. §§ 15A-1321 and -1322 (2009) and Article 5 of Chapter 122C of the General Statutes], applicable to acquittal by reason of mental illness." *Hammonds*, 290 N.C. at 15, 224 S.E.2d at 604 (emphasis added). The purpose of the instruction is to eliminate any "confusion" or "uncertainty" by the jury regarding "the fate of [the] accused if found insane at the time of the crime," *id.* at 15, 224 S.E.2d at 603-04, and to "remove any hesitancy of the jury in returning a verdict of not guilty by reason of insanity, engendered by a fear that by so doing they would be releasing the defendant at large in the community[,]" *State v. Harris*, 306 N.C. 724, 727, 295 S.E.2d 391, 393 (1982).

Our appellate courts have not set out "the precise instruction to be given" regarding the involuntary commitment procedures, but, rather, conduct a "case by case determination of whether there has been substantial compliance with the rule." *Id.* at 726, 295 S.E.2d at 393. The trial court's instruction on the consequences of a verdict of not guilty by reason of insanity are sufficient if the instruction explains the "substance," *Hammonds*, 290 N.C. at 15, 224 S.E.2d at 604, "gist," *State v. Bundridge*, 294 N.C. 45, 53, 239 S.E.2d 811, 817 (1978), or "central meaning," *Harris*, 306 N.C. at 727, 295 S.E.2d at 393, of the involuntary commitment procedures. At the charge conference, the trial court stated that it planned to give the jury the pattern jury instructions regarding the involuntary commitment process if a defendant is found not guilty by reason of insanity. N.C.P.I.—Crim. 304.10. Defendant made a written request to modify the pattern instructions to include the following italicized language:

A defendant found not guilty by reason of insanity shall immediately be committed to a State mental facility. After the defendant has been automatically committed, the defendant shall be provided a hearing within 50 days. *This hearing will be held in the*

*court in which the original trial was held. The hearing shall be open to the public. At this hearing and all subsequent hearings in which the defendant seeks his release from inpatient commitment, evidence that the defendant committed a homicide in the relevant past is prima facie evidence of dangerous[ness].* At this hearing the defendant shall have the burden of proving by a preponderance of the evidence that the defendant no longer has a mental illness, or is no longer dangerous to others. If the court is so satisfied, it shall order the defendant discharged and released. If the court finds that the defendant has not met his burden of proof, then it shall order that inpatient commitment continue for a period not to exceed 90 days. This involuntary commitment will continue, subject *to review first within 180 days and thereafter every year, until the court finds that the defendant no longer has a mental illness or is no longer dangerous to others.*

The trial court, after considering arguments from both sides, denied defendant's request and subsequently instructed the jury according to N.C.P.I.—Crim. 304.10.

On appeal, defendant contends that the trial court should have given his requested instruction because, "[t]he pattern instruction, unlike [defendant]'s requested instruction did not inform jurors that community members and the victims' family would be able to attend public hearings on whether [defendant] should be released; that at these meetings, the plentiful evidence that [defendant] was guilty of homicide would be strong evidence of his dangerousness to others; and that the periods of review would lengthen to 180 days and then one year." Our Supreme Court, in *Harris*, 306 N.C. at 727, 295 S.E.2d at 393, rejected a similar "claim[] that the [trial] court did not give the instructions [regarding involuntary commitment procedures] in sufficient detail." There, the trial court instructed the jury that if it found the defendant, who had been charged with first degree murder, not guilty by reason of insanity,

I then thereafter direct a verdict of not guilty because of that answer in each of these cases, I will order the defendant held in custody until such time as a hearing can be held to see whether or not he will be confined to a state hospital, at first for a period of not more than ninety days and then another hearing will be held in reference thereafter to see whether or not he will continue to be held in the State Hospital as involuntary committed mental patient from time to time.

*Id.* at 725-26, 295 S.E.2d at 392. The *Harris* Court held that the trial court's instructions, which provided the same substantive details as the instructions in this case, were "sufficient to remove any hesitancy of the jury in returning a verdict of not guilty by reason of insanity, engendered by a fear that by so doing they would be releasing the defendant at large in the community": "[the trial court] gave the jury the central meaning of the statute: that if defendant was acquitted by reason of insanity, he would not be released but would be held in custody until a hearing could be held to determine whether he should be confined to a state hospital." *Id.* at 727, 295 S.E.2d at 393.

In light of *Harris*, we conclude that the trial court did not err in refusing to give defendant's requested instruction regarding the consequences of a verdict of not guilty by reason of insanity and instructing the jury according to the pattern jury instruction on this issue. *See also State v. Allen*, 322 N.C. 176, 198-99, 367 S.E.2d 626, 638 (1988) ("The trial court gave the pattern jury instruction in N.C.P.I.—Crim. 304.10 which informed the jury of the commitment hearing procedures in N.C.G.S. §§ 15A-1321 and -1322, pursuant to article 5 of chapter 122C. This instruction adequately charged the jury regarding procedures upon acquittal on the ground of insanity. Defendant's assignment of error is overruled." (internal citation omitted)); *State v. Hall*, 187 N.C. App. 308, 318, 653 S.E.2d 200, 208 (2007) (holding that the trial court properly gave the pattern jury instruction for N.C.P.I.—Crim. 304.10, which is in accord with the applicable statutes).

## VI. Burden of Proof

[9] Defendant argues that the trial court's instructions to the jury lowered the State's burden of proving that defendant formed the specific intent to kill. The trial court provided the pattern jury instruction pertaining to diminished capacity to the jury as follows:

> Now you may find that there's evidence which tends to show that the defendant lacked mental capacity at the time of the acts alleged in this case. The law regarding lack of mental capacity is also referred to as diminished capacity. These terms are used interchangeably and refer to the same law; however, if you find that the defendant lacked mental capacity, you should consider whether this condition affected his ability to formulate the specific intent which is required for a conviction of first-degree murder or any other crime requiring specific intent. In order for you to find the defendant guilty of first-degree murder, you must find beyond a reasonable doubt that he killed the deceased with

malice and in the execution of an act with specific intent to kill, formed after premeditation and deliberation. If, as a result of lack of mental capacity, the defendant did not have the specific intent to kill the deceased formed after premeditation and deliberation, he is not guilty of first-degree murder.

> Therefore, I charge that if, upon considering the evidence with respect to the defendant's lack of mental capacity, you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first-degree murder, you will not return a verdict of guilty of first-degree murder. Th[ese] instructions will also apply to certain other charged offenses or lesser included offenses and I will specifically tell you when you're to recall and to consider this instruction on those offenses. And I will further tell you when it does not apply and you should not consider it.

As to each specific intent crime, the trial court instructed the jury:

> If you find from the evidence beyond a reasonable doubt that . . . the defendant [committed the offense charged], it would be your duty to return a verdict of guilty . . ., unless you are satisfied that the defendant was insane at that time and/or you are satisfied that the defendant lacked the mental capacity to formulate the specific intent required for conviction of this crime.

After completing the jury charge, *the* State suggested to the trial court that the latter instruction improperly shifted the burden of proof regarding specific intent to defendant. The trial court then altered the instruction and reinstructed the jury as follows:

> [I]f you find from the evidence beyond a reasonable doubt that the defendant [committed the offense charged], it would be your duty to return a verdict of guilty . . ., unless you are satisfied that the defendant was insane at that time and/or that the State has failed to prove beyond a reasonable doubt that the defendant had the required mental capacity to formulate the specific intent required for conviction of this crime.

Defendant specifically contends that the altered instruction lowered the State's burden to prove specific intent by requiring the State to prove only that defendant had the required mental capacity to form the specific intent required for conviction and did not require the State to prove that defendant actually formed the specific intent to kill.

There is a dispute as to whether defendant's argument is preserved for appeal. Defendant did not object to any of the instructions discussed above. In fact, defendant stated that he had no objection to the pattern jury instruction on diminished capacity and made no objection when the original mandate was given regarding specific intent. Later, when the State advised the trial court that the jury should be reinstructed on specific intent, defense counsel made no suggestions as to the rewording and made no objection to the final instruction. When the trial court asked defense counsel if he had anything to add to the reinstruction, he responded: "Well we don't have anything to add to the brilliance that's going on, Your Honor. It is above our pay grade." Defendant relies on *State v. Keel*, 333 N.C. 52, 56-57, 423 S.E.2d 458, 461 (1992), where the Court held that although no formal objection was entered, "[t]he State's request [for a pattern jury instruction], approved by the defendant and agreed to by the trial court, satisfied the requirements of Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure and preserved this question for review on appeal." There is an important distinction that defendant overlooks. In *Keel*, the requested instruction was unilaterally altered by the trial court to provide a misstatement of the law. *Id.* at 57, 423 S.E.2d at 461-62. Here, the trial court provided the reinstruction that was agreed upon verbatim. Defendant did not object to the instruction, and, arguably, acquiesced to the instruction he now claims is erroneous. Nevertheless, we will review the instruction for plain error.

"Long-standing precedent in this Court explains that the charge to the jury will be construed contextually, and segregated portions will not be viewed as error when the charge as a whole is free from objection." *State v. Haire*, —— N.C. App. ——, ——, 697 S.E.2d 396, 400 (2010). The segregated portion of the trial court's instructions to which defendant now objects states that the jury must find defendant guilty if it finds that defendant committed the killing unless "the State of North Carolina has failed to prove beyond a reasonable doubt that the defendant had the required mental capacity to formulate the specific intent required for conviction of this crime." We do not believe that the jury would infer, as defendant suggests, that "if [defendant] was capable of possessing specific intent, he necessarily did so." The trial court's instruction on diminished capacity specifically informed the jury: "In order for you to find the defendant guilty of first-degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an act with specific

intent to kill, formed after premeditation and deliberation." The trial court's reinstruction was an attempt to remedy any confusion as to which party bore the burden of proving specific intent. It was never unclear that specific intent, not just the ability to form it, is required for a conviction of first degree murder. We find no error, much less plain error, in the trial court's reinstruction.

## VII. Preservation Issues

Defendant presents several issues for preservation purposes, acknowledging that identical arguments have already been rejected by our Supreme Court.

### A. *Diminished Capacity Instruction*

Defendant first preserves his contention that he is entitled to an instruction on diminished capacity as a defense to first degree sexual offense. In *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996), our Supreme Court squarely rejected this argument, holding:

> Defendant further contends the trial court erred by failing to instruct on diminished capacity as that defense related to the charge of first-degree sexual offense. . . . First-degree sexual offense is not a specific intent crime; the intent to commit the crime is inferred from the commission of the act. Thus, diminished capacity is not a defense to first-degree sexual offense, and the trial court did not commit error . . . by failing to instruct on that defense.

*Id.* at 516, 459 S.E.2d at 761 (internal citation and quotation marks omitted). In light of *Daughtry*, defendant's argument in this case is overruled.

### B. *Sufficiency of Short-form Indictment*

Similarly, defendant preserves for further review his argument that the trial court erred in denying his motion to dismiss the murder, attempted rape, and sexual offense charges on the basis that the short form indictments charging defendant with these offenses fail to comply with procedural due process as they do not allege all the elements of each offense. With respect to the short-form indictment charging defendant with first degree murder, the Supreme Court has "held that indictments for murder based on the short-form indictment statute are in compliance with both the North Carolina and United States Constitutions." *State v. Braxton*, 352 N.C. 158, 174, 531

S.E.2d 428, 437 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001); *see also State v. Smith*, 352 N.C. 531, 539, 532 S.E.2d 773, 779 (2000) ("We reiterate here that [short-form] indictments based on N.C.G.S. § 15-144, like those charging defendant in this case, comply with both the North Carolina and the United States Constitutions.").

With respect to the first degree attempted rape and first degree sexual offense indictments, this Court has observed that "[b]oth our legislature and our courts have endorsed the use of short-form indictments for rape and sex offenses, even though such indictments do not specifically allege each and every element." *State v. Harris*, 140 N.C. App. 208, 215, 535 S.E.2d 614, 619 (2000); *see also State v. O'Hanlan*, 153 N.C. App. 546, 551, 570 S.E.2d 751, 755 (2002) ("We find nothing in our previous cases or in defendant's argument that persuades us the short form indictments for rape or sexual offense are invalid or unconstitutional."). These arguments are overruled.

## Conclusion

We hold that defendant was not in custody when he gave his first confession to police prior to receiving the *Miranda* warnings. His confession was, therefore, admissible at trial. We further hold that Dr. Radisch's testimony was properly admitted; however, assuming, *arguendo*, that Dr. Radisch's testimony violated defendant's right to confrontation, the error was harmless beyond a reasonable doubt. We hold that there was no error in the admission of Exhibit 39 and that the trial court was not required to intervene *ex mero motu* during the prosecutor's closing argument. We hold that the trial court's instructions to the jury were not erroneous and the trial court did not err in refusing to provide a special instruction on the commitment process should defendant be found not guilty by reason of insanity. Finally, the issues raised by defendant for preservation purposes are without merit.

No Error.

Judges STEPHENS and ERVIN concur.