IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-659

No. COA20-556

Filed 7 December 2021

Martin County, No. 14 CRS 824; 14 CRS 51179; 19 CRS 128

STATE OF NORTH CAROLINA

v.

KEITH AARON BUCKLEW, Defendant.

Appeal by Defendant from judgment entered 11 December 2019 by Judge Leonard L. Wiggins in Martin County Superior Court. Heard in the Court of Appeals 26 May 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

*The Robinson Law Firm, P.A., by Leslie S. Robinson, for Defendant-Appellant.*

WOOD, Judge.

¶ 1     Keith Bucklew ("Defendant") appeals from judgments from the superior court finding Defendant guilty of assault with a deadly weapon inflicting serious injury, felony serious injury by a motor vehicle, and driving while impaired. We hold the trial court committed no error.

## I.     Background

¶ 2     The appeal arises from the convictions of Defendant, a retired Marine with twenty years of service. On November 26, 2014, Defendant was driving himself and

his ten year old son in a white Land Rover. An eyewitness reported Defendant was speeding, drifting within his lane toward the center line, crossing the center line, and driving erratically and aggressively. Around dusk, Defendant's Land Rover swerved into oncoming traffic and hit a white Cadillac Escalade driven by Tina Wasinger ("Wasinger"), with her two minor sons as passengers, and a Hyundai Sante Fe driven by Richard Sermon ("Sermon"), with his wife and four children as passengers. Trooper Mark Peaden ("Trooper Peaden") of the North Carolina State Highway Patrol responded to the call. Trooper Peaden observed that Defendant and Wasinger's vehicles had heavy front end damage and Sermon's vehicle appeared to have been sideswiped. As a result of the collision, Wasinger suffered both significant, long-term, physical injuries and the loss of her job. At the scene of the accident, Trooper Peaden observed that there were no apparent skid marks indicating an attempt to stop the vehicle.

¶ 3        Trooper Peaden located Defendant at the scene and noted Defendant appeared impaired; acted loopy, apathetic, and lethargic; had slurred speech; and was very tired. Due to Defendant's injuries, Defendant was transported to the hospital. Defendant had sustained substantial injuries, including a fractured femur and broken hand.

¶ 4        At the hospital, Defendant was described as having "droopy eyelids, a blank stare, slurred speech and [was] lethargic"; but also having a few coherent moments

where he could answer questions. In response to Trooper Peaden's inquiry about whether Defendant was taking any medication or drinking alcohol, Defendant responded he was on oxycodone, valium, and morphine which he reported he last took at 4:00 o'clock that morning. Trooper Peaden performed an alcosensor breath test on Defendant which indicated Defendant had not consumed alcohol prior to the collision.

¶ 5 Trooper Peaden found Defendant to be at-fault in the collision and impaired to the extent he was unable to appreciate the danger of the collision. Trooper Peaden placed Defendant under arrest for driving while impaired ("DWI"), notified Defendant of his rights to a chemical analysis test, and requested Defendant to submit to a chemical analysis test. Defendant's blood sample revealed the presence of oxycodone, diazepam, nordiazepam, and morphine. A urine screen conducted at the hospital was positive for benzodiazepines, opiates, and tricyclic antidepressants.[1] Defendant was transported by helicopter to another hospital to receive a higher level of care after the blood draw was complete. On November 26, 2014, Defendant was indicted for assault with a deadly weapon inflicting serious injury, DWI, misdemeanor child abuse, and felony serious injury by vehicle.

¶ 6 Defendant filed a pretrial motion to suppress the seizure and analysis of his

---

[1] Benzodiazepines work to sedate or calm a person and includes medication such as Valium. NAT'L INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/drug-topics/opioids/benzodiazepines-opioids, (last visited Oct. 15, 2021).

blood. The trial court denied Defendant's motion to suppress, explaining that based upon testimony from Trooper Peaden; the eyewitness's, a hospital nurse's, Defendant's and Sermon's statements; the emergent medical care needed by Defendant; and the results of Defendant's blood draw, there was sufficient probable cause to charge Defendant with the offense of DWI and there was sufficient exigent and articulable basis to conduct a warrantless blood draw for a chemical analysis. The trial court also denied Defendant's motion for judicial notice of the National Weather Service's weather report ("Weather Report"), motions to dismiss, objection to the lab and chain of custody report, and objection to the analyst's testimony regarding Defendant's blood sample. On December 11, 2019, Defendant was found guilty of assault with a deadly weapon inflicting serious injury, DWI, and felonious serious injury by a motor vehicle. On appeal, Defendant contends the trial court erred by denying Defendant's motion for judicial notice, motion to suppress the blood draw, and motion to dismiss, and by admitting, over Defendant's objection, the lab result and chain of custody report and analyst's testimony.

## II. Discussion

### A. Motion to Suppress Defendant's Blood Draw

#### 1. *Competent Evidence Existed*

¶ 7      We turn first to Defendant's contention the trial court's findings of fact in the order denying Defendant's motion to suppress the blood draw (the "Denial Order")

were not supported by competent evidence. We note at the outset the standard of review for a motion to suppress is not substantial competent evidence, but rather a lower threshold of competent evidence. *State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011). "In reviewing a trial judge's ruling on a suppression motion, we determine only whether the trial court's findings of fact are supported by *competent evidence*, and whether these findings of fact support the [trial] court's conclusions of law." *State v. Pulliam,* 139 N.C. App. 437, 439-40, 533 S.E.2d 280, 282 (2000) (citation omitted and emphasis added)). The trial court's findings of fact which are supported by competent evidence are "conclusive on appeal . . . even if the evidence is conflicting." *State v. Buchanan*, 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2010) (quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994)). "[T]he trial court's conclusions of law are reviewed de novo and must be legally correct." *State v. Scruggs*, 209 N.C. App. 725, 727, 706 S.E.2d 836, 838 (2011) (citation omitted).

¶ 8 Here, the findings of fact in the Denial Order support the conclusion probable cause and exigent circumstances existed to initiate a warrantless blood draw. Probable cause is the "facts and circumstances within an officer's knowledge and of which he had reasonably trust-worthy information which are sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *State v. Williams*, 314 N.C. 337, 343, 333 S.E.2d 708, 713 (1985) (citations

omitted). Whether exigent circumstances exist as to justify a warrantless blood draw, though yet to be precisely defined, depends on the totality of the circumstances. *Missouri v. McNeely*, 569 U.S. 141, 156, 133 S. Ct. 1552, 1563, 185 L. Ed. 2d 696, 709 (2013); *State v. McCrary*, 237 N.C. App. 48, 53, 764 S.E.2d 477, 481 (2014).

¶ 9     We are not persuaded by Defendant's argument the Denial Order's findings of fact were not supported by competent evidence. The evidence in the record tends to show the eyewitness reported that Defendant, prior to collision, crossed the center line, drifted within his lane, and drove aggressively and erratically. Sermon testified Defendant's vehicle swerved from oncoming traffic and "almost made like a left turn directly into [Wasinger's vehicle] . . . ." Once Trooper Peaden arrived at the scene, he noted there were no skid marks indicating any attempt to stop. After Defendant was transported to the hospital due to his injuries, a breath alcosensor test revealed no presence of alcohol, but Defendant admitted to taking oxycodone, valium, and morphine that morning. When Trooper Peaden spoke with Defendant at the hospital, he noticed Defendant had slurred speech, a loopy demeanor, was lethargic and slow to answer questions. At one point Defendant told Trooper Peaden he did not remember what happened while, at another point, he told Trooper Peaden he was hit by a car. Nurse Warren, a nurse at the first hospital to which Defendant was taken, testified Defendant had a significant injury to his femur, injury to his neck, a contusion, a fracture, swelling, and enlarged pupils, and that he was falling asleep

between questions.

¶ 10    Based off his observations, Trooper Peaden formed the opinion Defendant had consumed a "sufficient quantity of impairing substances so that his mental and physical facilities were appreciably impaired." However, Trooper Peaden did not have time to leave the hospital to acquire a search warrant because Defendant was "very, very badly injured" and the hospital does not administer pain medication until after a blood draw is performed. Defendant's injuries, moreover, were so severe as to warrant air-lifting Defendant to another hospital for a higher level of care after the blood draw was complete. Based on the evidence presented at trial, there was competent evidence to support the findings of fact in the Denial Order.

¶ 11    In addition to a general challenge to the findings of fact in the Denial Order, Defendant specifically challenges findings of fact twelve, fourteen, seventeen, and twenty-three.

### a. No Error as to Finding of Fact Number 12

¶ 12    Finding of fact number twelve states, "Stacy Toppin, RN, described the defendant as alert and able to answer questions. She described his speech as slow and thick tongued. He was further described as neurologically intact with no visible head injuries. She described his pupils as appearing pinpoint." Competent evidence exists to support fact number twelve through Stacy Toppin's testimony where she stated Defendant "had slurred speech at the time, [was a] little thick tongue, [and

had a] little bit of confusion[,]" and his pupils were "pinpoint looking." On *voir dire*, Stacy Toppin explained that Defendant had no apparent head injuries, was stable, and was able to answer questions. The testimony provided by Stacy Toppin provided competent evidence to support finding of fact number twelve.

> ### b. *No Error as to Findings of Fact Number 14 and 17*

¶ 13      Findings of fact fourteen and seventeen state:

> (14) [i]n addition to defendant's statement and disclosures, Trooper Peaden also administered a portable breath test in an effort to rule out the presence of alcohol. Due to the acute nature of the defendant's injuries, the court finds that it was not appropriate to administer or attempt to administer the Horizontal Gaze Nystagmus, the Walk and Turn or One-legged stand test standard field sobriety tests due to the acute nature of the defendant's injuries and the dynamic and emergent medical nature of the environs and surroundings of a medical facility.
>
>  . . .
>
> (17) [a]fter stabilizing treatment was administered at Martin General Hospital, the defendant was subsequently transferred to Vidant Greenville for further and more advanced trauma care, which further demonstrated the dynamic and emergent medical care needed by the defendant which further underscores the necessity and exigency for a blood draw."

¶ 14      At trial, the evidence showed Defendant sustained substantial injuries including a broken hand and fractured femur. Defendant's injuries were so severe he ultimately had to be transported by helicopter to another hospital for more advanced care. Despite the existence of conflicting evidence which may refute finding of fact

number fourteen, conflicting evidence does not affect a finding of fact which is supported by competent evidence. *Buchanan*, 353 N.C. at 336, 543 S.E.2d at 826. Based on the severity of Defendant's injuries, findings of fact numbers fourteen and seventeen were supported by competent evidence.

### c. *No Error as to Finding of Fact 23*

¶ 15 Finding of fact number twenty-three states, "[n]o search warrant was obtained or necessary based on the facts and totality of the circumstances presented." The evidence tends to show Trooper Peaden found probable cause existed Defendant had committed the offense of DWI based on Defendant's admission to taking multiple medications, the lack of skid marks indicating any attempt to stop, eyewitness reports of Defendant's erratic driving, and Defendant's lethargic and loopy behavior. Moreover, per our analysis above, Defendant's injuries were substantial and required immediate medical care, including the administration of pain-relieving medication. Because of the evidence presented, finding of fact number twenty-three is based upon competent evidence.

## 2. *Warrantless Blood Draw was Justified*

¶ 16 Next, Defendant argues the findings of fact do not support the conclusion that exigent circumstances and probable cause existed to support a warrantless blood test. Both the Fourth Amendment to the United States Constitution and Article I Section 20 of the North Carolina Constitution protect a person from unreasonable searches

and seizures. U.S. Const. Amend. IV; N.C. Const. art. I, § 20. Blood tests "plainly constitute searches of persons" and thus are considered seizures under the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834, 16 L. Ed. 2d 908, 918 (1996) (internal quotation marks omitted); *see also State v. Carter*, 322 N.C. 709, 714, 370 S.E.2d 553, 556 (1988) (holding "[t]he withdrawal of a blood sample from a person is a search subject to protection by article I, section 20 of our constitution"). A blood test may only be performed after a warrant or valid consent is obtained or under exigent circumstances with probable cause "unless probable cause and exigent circumstances exist that would justify a warrantless search." *State v. Welch*, 316 N.C. 578, 585, 342 S.E.2d 789, 793 (1986). *See State v. Romano*, 369 N.C. 678, 692, 800 S.E.2d 644, 653 (2017).

¶ 17 First we must determine whether probable cause existed. Probable cause is defined as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." *State v. Smith*, 222 N.C. App. 253, 255, 729 S.E.2d 120, 123 (2012) (citation omitted)." *See Carroll v. United States*, 267 U.S. 132, 161, 45 S. Ct. 280, 288, 69 L. Ed. 543, 555 (1925) (citation omitted). Here, the circumstances provided Trooper Peaden with reasonable grounds to suspect Defendant had committed the offense of a DWI. Prior to the accident, an eyewitness placed a 911-call to report to the police Defendant was driving erratically, Defendant's vehicle was "weaving about the road[,]" and

Defendant ultimately struck two vehicles. Upon arriving to the scene of the accident, Trooper Peaden discovered further evidence which indicated Defendant was responsible for the crash. Trooper Peaden observed vehicle debris were "everywhere", three heavily damaged vehicles were present including Defendant's car, and no brake skid marks were present to indicate anyone attempted to stop their vehicles prior to the collision. All three vehicles rested outside of and to the left of Defendant's lane of travel. Trooper Peaden did not detect alcohol on Defendant, but Defendant voluntarily admitted to taking his medications that morning. Defendant held valid prescriptions for oxycodone, valium, and morphine and voluntarily stated to Trooper Peaden he had last taken his medications that morning at 4 a.m. Trooper Peaden described Defendant as lethargic, and having slurred speech, droopy eyelids, and a blank stare. However, Defendant's injuries were of such severity that he was classified as a trauma patient and was rapidly deteriorating. Based on these findings of fact, the trial court properly concluded probable cause existed to perform a warrantless blood test. Accordingly, this Court is compelled to hold the trial court did not err when it determined probable cause existed for Trooper Peaden to form the opinion that Defendant had committed the offense of DWI so as to justify a warrantless blood test.

¶ 18        Turning our analysis to whether the findings of fact supported the conclusion exigent circumstances were present, the underlying question as to whether exigent

circumstances exist is whether "there is a compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149, 133 S. Ct. 1552, 1559, 185 L. Ed. 2d 696, 705 (2013) (citation omitted). In the case of a DWI, the reasonableness of a warrantless blood test "must be determined case by case based on the totality of the circumstances." *Id.* at 156, 133 S. Ct. at 1563, 185 L. Ed. 2d at 709 (2013). *See State v. Dahlquist*, 231 N.C. App. 100, 103, 752 S.E.2d 665, 667 (2013). Though the natural dissipation of a substance within a person's blood stream is a factor to consider, it is not a *per se* exception to the totality of the circumstances test. *McNeely*, 569 U.S. at 156, 133 S. Ct. at 1563, 185 L. Ed. 2d at 709. In *State v. Granger*, we held a totality of the circumstances illustrated exigent circumstances when sufficient probable cause had already been established, the officer could not thoroughly investigate due to the extent of defendant's injuries, delays in the warrant application process, and the potential of imminent administration of pain medication. *State v. Granger*, 235 N.C. App. 157, 165, 761 S.E.2d 923, 928 (2014).

¶ 19    In this case, like *Granger*, a totality of the circumstances shows exigent circumstances existed to justify a warrantless blood draw. First, sufficient probable cause existed to establish Defendant was driving while impaired prior to the initiation of the blood draw. Next, the officer was not able to thoroughly question Defendant at the scene of the accident because Defendant was "pinned in his vehicle" and subsequently taken to the hospital as a trauma patient due to the extent of

Defendant's injuries. Indeed, Defendant's own affidavit confirmed Defendant's injuries caused "acute blood loss." Moreover, Defendant's "condition was deteriorating" due to his injuries. In light of these circumstances, the officer did not have the time necessary to acquire a search warrant due to the extent of Defendant's injuries and the fact that pain medication in par with stabilizing treatment was administered immediately after a blood drawn was taken. Defendant was transferred to another hospital for advanced trauma care due to the severity of his injuries and his deteriorating medical condition. Although we question the efficacy of reading Defendant his Notice of Rights when he was in such critical condition, the totality of the circumstances in the instant case shows the lack of time to acquire a warrant in light of the compelling need to perform a blood test on Defendant once the officer formed the opinion that Defendant had driven while impaired. Thus, we must hold the trial court did not err when finding sufficient exigent circumstances existed to justify a warrantless blood draw.

## B. Judicial Notice of Weather Conditions

Defendant next argues the trial court erred by not taking judicial notice of the Weather Report. We also conclude the trial court did not err by denying to take judicial notice of the National Weather Station's weather conditions on the date of the collision. Under N.C. Gen. Stat. § 8C-1 Rule 201(b) "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known

within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." N.C. Gen. Stat. § 8C-1, Rule 201(b) (2021). An indisputable fact is one that is "so well established as to be a matter of common knowledge." *In re L.G.A.*, 277 N.C. App. 46, 2021-NCCOA-137, ¶24 (citation omitted). A trial court has discretion when deciding whether or not to take judicial notice, and this Court reviews for abuse of discretion. *State v. McDougald*, 38 N.C. App. 244, 248, 248 S.E.2d 72, 77 (1978). However, a court "cannot take judicial notice of a disputed question of fact," *Hinkle v. Hartsell*, 131 N.C. App. 833, 836, 509 S.E.2d 455, 458 (1998) (citation omitted), and "any subject that is open to reasonable debate is not appropriate for judicial notice." *In re R.D.*, 376 N.C. 244, 264, 852 S.E.2d 117, 132 (2020) (citation and internal ellipses omitted).

¶ 21       This Court's opinion in *State v. McDougald* describes an applicable example of when the trial court did not abuse its discretion by denying a defendant's motion to take judicial notice. In *McDougald*, the defendant appealed the trial court's denial to take judicial notice of news broadcasts concerning the case. *State v. McDougald*, 38 N.C. App. 244, 248, 248 S.E.2d 72, 77 (1978). The *McDougald* Court rejected the defendant's assignment of error, writing, "[s]uch facts could have been easily proven by witnesses ordinarily available. There was no showing of abuse of discretion by the trial court. Therefore, the trial court did not err in failing to take judicial notice that

the case was the subject of radio and television broadcasts." *Id.* *McDougald* held a trial court does not abuse its discretion when denying to take judicial notice of a fact if there exists an opportunity to otherwise prove the fact at trial.

¶ 22         This concept has direct application to the trial court's decision not to take judicial notice of the Weather Report in this case. The trial court denied Defendant's motion for judicial notice as multiple witnesses testified to the weather conditions on the date of the collision. Thus, the trial court had the right to conclude sufficient evidence existed from the witnesses' testimonies to allow the jury to form their own conclusion on the state of the weather. Following the reasoning in *McDougald*, the trial court did not abuse its discretion when it declined to take judicial notice of the National Weather Service weather conditions report on the date of collision.

¶ 23         Against this conclusion, Defendant argues his motion for judicial notice should have been granted under N.C. Gen. Stat. § 8C-1, Rule 201(d). Rule 201(d) states "[a] court shall take judicial notice if requested by a party and supplied with the necessary information." § 8C-1, Rule 201(d). The implication, Defendant argues, is that "the trial court has no discretion when supplied with the information prescribed by Rule 201." Of course Rule 201(d) is only a portion of Rule 201 as a whole, and thus we must view section (d) in light of the entirety of Rule 201. *See Pilos-Narron v. Narron*, 239 N.C. App. 573, 771 S.E.2d. 633 (2015) (viewing the portion of Rule 56(e) quoted by plaintiff in its entirety).

¶ 24　　　　　Section (d) of Rule 201 is predicated upon the two-part test of Rule 201's Section (b) which states a judicially noticed fact is one that cannot be reasonably disputed because it is either 1) general knowledge or 2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." § 8C-1, Rule 201(b).  The issue in contention here is the level of rain fall at the time of the collision, thus why, not unreasonably, Defendant wanted the trial court to take judicial notice of the Weather Report.  However, the contentious issue, the level of rainfall fails the first prong of Section (b)'s test because though individuals may know if it is raining, the precise amount of rain is not a generally known fact.  Under the second prong of the test, sources as used in Section (b) must be "a document of such indisputable accuracy as [to] justif[y] judicial reliance."  *State v. Dancy*, 297 N.C. 40, 42, 252 S.E.2d 514, 515 (1979).  The amount of rain is generally a fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  N.C. Gen. Stat. § 8C-1, Rule 201(b) (2021).  In *State v. Canaday*, this Court held a document of indisputable accuracy "contemplates material from a primary source in whose hands the gathering of such information rests."  110 N.C. App. 763, 766, 431 S.E.2d 500, 501 (1993).  Flowing from our reasoning in *Canaday*, weather reports from the National Weather Service are a result of data gathered by the National Weather Service and thus typically are

documents of indisputable accuracy.[2]  *See Bain Enters., LLC v. Mountain States Mutality Casualty Co.*, 267 F. Supp. 3d 796, 819 (W.D. Tex. 2016); *Kovera v. Envirite of Ill., Inc.*, 2015 IL App (1st) 133049, ¶28.

However, this proffered Weather Report from the National Weather Service is not a document of indisputable accuracy for the purpose of illustrating the amount of rain on the date of the collision.  The Weather Report for the date of the crash does not state the level of rain that was occurring at the time of the crash.  An examination of the Weather Report reveals the level of rain stopped being reported for the day up to three hours prior to the collision.  The party moving for judicial notice has the responsibility to "supply [the trial judge] with appropriate data" as the "trial judge is not required to make an independent search for data of which he may take judicial notice."  *Dancy*, 297 N.C. at 42, 252 S.E.2d at 515.  Because the proffered weather report did not contain the necessary data showing the level of rain at the time of the collision, the Weather Report fails under the second prong of Rule 201(b).  The trial

---

[2] Forecast from the National Weather service is the product of observations from scientists "using technology such as radar, satellite and data from an assortment of ground-based and airborne instruments to get a complete picture of current conditions.  Forecasters often rely on computer programs to create what's called an 'analysis,' which is simply a graphical representation of current conditions.  Once this assessment is complete and the analysis is created, forecasters use a wide variety of numerical models, statistical and conceptual models, and years of local experience to determine how the current conditions will change with time.  Numerical modeling is fully ingrained in the forecast process, and our forecasters review the output of these models daily."  NATIONAL WEATHER SERVICE, https://www.weather.gov/about/forecast-process (last visited Sept. 21, 2021).

court was not required under Rule 201(d) to take judicial notice but was free to use its discretion pursuant to Rule 201(c). Accordingly, we are compelled to hold the trial court did not abuse its discretion by not taking judicial notice of the Weather Report.

**C. Lab and Chain of Custody Report**

¶ 26    We next turn to Defendant's assignment of error to the trial court's admission of the lab and chain of custody report (the "Report") of Defendant's blood and Evan Lowery's ("Lowery") testimony regarding Defendant's blood sample. Defendant argues his right to confrontation and cross-examination were violated because only Lowery, the State's independent expert, testified at trial, not the people who actually conducted the analysis of his blood and urine samples. We disagree and conclude the trial court did not err in admitting the Report.

¶ 27    First, Lowery's testimony was properly admitted by the trial court. The United States Constitution's Confrontation Clause prohibits expert testimony that is predicated only on the reports of an analyst who is not testifying. *State v. Locklear*, 363 N.C. 438, 452-53, 681 S.E.2d 293, 304-05 (2009). An expert's testimony is nonetheless admissible "when the expert testifies not just to the results of other experts' tests, but to her own technical review of these tests, her own expert opinion of the accuracy of the non-testifying experts' tests, and her own expert opinion based on a comparison of the original data." *State v. Hartley*, 212 N.C. App. 1, 12-13, 710 S.E.2d 385, 396 (2011) (citation and internal quotations omitted). The crucial

question here is whether Lowery's testimony was merely a recitation of the analysts' Report or was his independent expert opinion derived from the proper methods.

¶ 28    A review of the record reveals Lowery's expert testimony was admissible. Lowery was admitted as an expert in forensic toxicology and utilized his "training, education, and experience" in conducting his analysis of the data. Though Lowery received data from the analysis done at the crime lab, Lowery analyzed and reviewed the data, analyzed Defendant's blood sample in accordance with the North Carolina State Crime Laboratory and Department of Health and Human Services, crafted with his own opinion as to the results of the data, and finally produced the Report utilized at trial. In other words, the Report introduced at trial was created by Lowery, not the analysts who did not testify. Although the data used by Lowery originated from other analysts, the Report was an independent expert opinion analyzed and created by Lowery, and, accordingly, the trial court did not err in admitting Lowery's testimony.

¶ 29    Second, Defendant argues the State failed to establish the chain of custody and the trial court erred in admitting the chain of custody report. Our Supreme Court requires a two-prong test to be satisfied prior to the admission of evidence: the "item offered must be identified as being the same object involved in the incident and it must be shown that the object has undergone no material change." *State v. Taylor*, 332 N.C. 372, 388, 420 S.E.2d 414, 423-24 (1992) (quoting *State v. Campbell*, 311 N.C.

386, 388, 317 S.E.2d 391, 392 (1984)). The State does not need to establish a detailed chain of custody unless "the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been altered." *Campbell*, 311 N.C. at 389, 317 S.E.2d at 392. Even if the chain of custody does have points of weakness, this only goes to the "weight to be given the evidence and not to its admissibility." *Id.* (citation omitted).

¶ 30 In light of these principles, we hold the trial court did not abuse its discretion by finding the State established an adequate chain of custody. Trooper Peaden testified after Defendant's blood was taken by the nurse, the blood was then transferred to the officer. The blood vial contained a security seal which identifies Defendant, the person who drew the blood, and the date and time. The subsequent signatories to the chain of custody revealed Defendant's blood sample was received by the State crime lab. Lowery testified to the chain of custody of Defendant's blood from the date it was received by the State crime lab until the date the blood was analyzed. The testimonies from both Trooper Peaden and Lowery satisfy both prongs required for admission of evidence by our Supreme Court. The security seal upon the vial and the chain of custody report tend to prove the sample at all times contained Defendant's blood and no material change occurred throughout the transfers and testing of the blood. *See Taylor*, 332 N.C. at 388, 420 S.E.2d at 423-24. In summation, the testimony presented effectively established the chain of custody and the trial

court committed no error by admitting the chain of custody report.

¶ 31        Defendant raises questions about the circumstances surrounding his blood sample in order to undermine the admissibility of the chain of custody report. These purported points of weakness only go to the "weight to be given the chain of custody not its admissibility." *Campbell*, 311 N.C. at 389, 317 S.E.2d at 392. Under *Campbell*, the evidence presented must not only be susceptible to alteration or not readily identifiable, but also there must be a reason to believe the evidence was altered. *Id.* Here, Defendant offered no reason to believe the blood sample was altered and thus his attempt to present questionable circumstances surrounding the blood sample fails under *Campbell*. The conclusion follows that the trial court did not abuse its discretion by admitting the chain of custody report.

## D. Defendant's Motion to Dismiss

¶ 32        Finally, we look to Defendant's argument the trial court erred in denying Defendant's motion to dismiss first at the close of the State's evidence and then at the close of all evidence. We review a motion to dismiss *de novo*. *Locklear v. Cummings*, 262 N.C. App. 588, 592, 822 S.E.2d 587, 590 (2018). In a criminal trial, the law is well settled as follows, "upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Powell*,

299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). A motion to dismiss should be allowed if the evidence only raises a "suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it." *Id.* (citations omitted). Evidence is to be viewed in "the light most favorable to the State" and tested only to determine if a "*reasonable* inference of the defendant's guilt of the crime charged may be drawn from the evidence." *Id.* at 99, 261 S.E.2d. at 117 (citations omitted and emphasis in original).

¶ 33        Defendant alleges there was no substantial evidence for the offenses of impaired driving, assault with a deadly weapon inflicting serious injury, and felonious serious injury by vehicle. First, Defendant was charged with driving while impaired under N.C. Gen. Stat. § 20-138.1 which provides, in relevant parts, "[a] person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State . . . [w]hile under the influence of an impairing substance . . . ." N.C. Gen. Stat. § 20-138.1(a) (2021). The State showed a white Land Rover was reported to be driving erratically upon a public road in North Carolina; a crash later occurred caused by the Land Rover; and when Trooper Peaden arrived at the scene, Defendant was trapped inside the Land Rover in the driver's seat. As analyzed above, probable cause existed to charge Defendant with the offense of DWI based upon eyewitness reports of Defendant's erratic driving, the severity of the crash, Defendant's admission of taking his

medications that morning, Defendant's impaired behavior, and the result of Defendant's blood test. As such, we are obligated to hold substantial evidence exists to support each element of driving while impaired and that Defendant was the one who committed the DWI.

¶ 34    Next, Defendant was charged with assault with a deadly weapon inflicting serious injury to Tina Wasinger pursuant to N.C. Gen. Stat. 14-32(b) which states, "[a]ny person who assaults another person with a deadly weapon and inflicts serious injury shall be punished as a Class E felon." N.C. Gen. Stat. § 14-32(b) (2021). The elements of a Statute 14-32(b) are "(1) an assault (2) with a deadly weapon (3) inflicting serious injury (4) not resulting in death." *State v. Aytche*, 98 N.C. App. 358, 366, 391 S.E.2d 43, 47 (1990). An assault is "an overt act or attempt, with force or violence, to do some immediate physical injury to the person of another, which is sufficient to put a person of reasonable firmness in fear of immediate physical injury." *State v. Jones*, 353 N.C. 159, 164, 538 S.E.2d 917, 922 (2000) (citation omitted). A deadly weapon is "any article, instrument or substance which is *likely* to produce death or great bodily harm." *Id.* (citation omitted and emphasis in original).

¶ 35    In North Carolina, an automobile "can be a deadly weapon if it is driven in a reckless or dangerous manner." *Id.* One who "operates a motor vehicle in a manner such that it constitutes a deadly weapon, thereby proximately causing serious injury to another, may be convicted of AWDWISI provided there is either an actual intent

to inflict injury or culpable or criminal negligence from which such intent may be implied." *Id.* at 164-65, 538 S.E.2d at 922-23. Culpable or criminal negligence is defined as "such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others." *Id.* at 165, 538 S.E.2d at 923 (quoting *State v. Weston*, 273 N.C. 275, 280, 159 S.E.2d 883, 886 (1968)).

¶ 36   Particularly, culpable negligence exists when a safety statute is unintentionally violated and is "accompanied by recklessness of probable consequences of a dangerous nature, when tested by the rule of reasonable [foreseeability], amounting altogether to a thoughtless disregard of consequences or of a heedless indifference to the safety of others." *Id.* (quoting *State v. Hancock*, 248 N.C. 432, 435, 103 S.E.2d 491, 494 (1958)). A safety statue is one that is "designed for the protection of human life or limb." *State v. McGill*, 314 N.C. 633, 637, 336 S.E.2d 90, 92 (1985) (citation omitted). We note as well, N.C. Gen. Stat. § 20-138.1 is a safety statute created to protect human life or limb by prohibiting driving impaired. *See Jones*, 353 N.C. at 165, 538 S.E.2d at 923.

¶ 37   In the case before us, Defendant assaulted Wasinger by hitting her vehicle with his vehicle, a white Land Rover. According to eyewitness reports and the lack of skid marks to indicate an attempt to stop his vehicle, Defendant was driving his vehicle in an erratic and reckless manner. Thus, Defendant's vehicle may be considered a

deadly weapon. As a matter of law, Defendant's culpable negligence was established when Defendant proceeded to operate a vehicle while under the influence of impairing substances. Such negligence was further shown by reports of Defendant's driving from both Sermon and another eyewitness. Though Wasinger survived the crash, she suffered serious injury, including weeks in the hospital, two months in a wheelchair, and extremely restricted movement of her hand and legs. Due to her injuries, Wasinger lost her job and is now enrolled in disability with Social Security. In sum, the elements of assault with a deadly weapon inflicting serious injury were satisfied, and we affirm the judgment of the trial court.

¶ 38      Defendant was also convicted of felony serious injury by motor vehicle under N.C. Gen. Stat. § 20-141.4(a3) which provides,

> A person commits the offense of felony serious injury by vehicle if:
>
> (1) The person unintentionally causes serious injury to another person,
>
> (2) The person was engaged in the offense of impaired driving under G.S. 20-138.1 or G.S. 20-138.2, and
>
> (3) The commission of the offense in subdivision (2) of this subsection is the proximate cause of the serious injury.

N.C. Gen. Stat. § 20-141.4(a3) (2021). Because we have already explained that substantial evidence exists to illustrate Defendant caused serious injury to Wasinger due to his driving while impaired, the elements of felony serious injury by motor

vehicle were met. Thus, the trial court did not err in denying Defendant's motion to dismiss.

### III.   Conclusion

¶ 39          As a result of the foregoing analysis, we are compelled to hold there was no error when the trial court denied Defendant's motion to suppress the blood draw, declined to take judicial notice of the Weather Report, admitted the Report and Lowery's testimony, and denied Defendant's motion to dismiss. While we sympathize with Defendant in that he was operating his vehicle while under the influence of only prescribed medications and not under the influence of alcohol and was also seriously injured in the resulting collision, we hold that the Defendant received a fair trial free from error.

NO ERROR.

Judge DIETZ concurs by separate opinion.

Judge INMAN concurs.

DIETZ, Judge, concurring.

¶ 40       I concur in the majority's judgment but would resolve the suppression issue solely based on the evidence of impairment establishing probable cause, and the exigency resulting from the need to draw blood before medical professionals administered additional medications, without reference to the implied consent laws. *See Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2532 (2019).